IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:11 CR 00468 T SCB MAP


UNITED STATES OF AMERICA


          Plaintiff,
v.                              September 17, 2013
                                    9:16 a.m.


ALMA L. HERNANDEZ-PRECIADO,

          Defendant.
_____/



TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Government:      JOSEPH RUDDY
                         Assistant U.S. Attorney
                         U.S. Attorney's Office
                         400 North Tampa Street
                         Suite 3200
                         Tampa, FL 33602


For the Defendant:       VICTOR MARTINEZ
                         Victor D. Martinez, PA
                         423 S Hyde Park Ave
                         Tampa, FL 33606

Reported By:            Sandra K. Provenzano, RPR
                        Official Court Reporter
                        U.S. District Court
                        801 North Florida Avenue
                        Tampa, FL 33602
                        (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

INDEX

WITNESS:                                          PAGE:

BYRON SAJBIN PEREZ                                   7
     CONTINUED DIRECT EXAMINATION                    7
BY MR. RUDDY
JOELMIR MENDEZ ALDANA                               13
     DIRECT EXAMINATION                             14
BY MR. RUDDY
     CROSS-EXAMINATION                              23
BY MR. MARTINEZ
MIGUEL LARA                                         31
     DIRECT EXAMINATION                             31
BY MR. RUDDY
     CROSS-EXAMINATION                             1Ø3
BY MR. MARTINEZ
     REDIRECT EXAMINATION                           129
BY MR. RUDDY

                          *****


EXHIBITS:                    IDENTIFIED:

EXHIBITS:                    RECEIVED:

  13A AND 13B        19
  14A AND 14B        98
  13A-1             1Ø1

```
 1                    P R O C E E D I N G
 2              THE COURT:  All right.  How about the
 3    interpreters?  How are we?
 4              THE INTERPRETER OCASIO:  We are doing fine,
 5    Your Honor.  We're working.
 6              THE COURT:  I passed it on, if you have
 7    something electronic, something to bring in, happily
 8    bring it in.  If I need to do an order.  I'll do an
 9    order.
10              What about the headphones?
11              THE INTERPRETER LEONOR:   It's difficult
12    when you have to listen without the amplification, Your
13    Honor.  But we have been doing it so far.
14              THE COURT:  Do you just have one head phone?
15              THE INTERPRETER LEONOR: We don't have any.
16    We are just hearing off the speakers itself.
17              THE COURT:  I just talked to George, and he
18    said there were two up here or maybe they're not here.
19              Susan, do you know anything about that?
20    Whatever you can do is fine with me.
21              THE INTERPRETER LEONOR: It's fine so far,
22    just hearing the overhead speakers.  Thank you.
23              THE COURT:  All right.  Mr. Ruddy -- yeah,
24    you can have a seat.
25              MR. RUDDY:  Your Honor, I am only going to
```

play a few more tapes with this witness.  I was pushing
everybody to the brink.  I apologize for that.  There are
a couple more.  They're fairly short, and I'll play them.
I'm trying to get this done as quickly as possible.

THE COURT:  Okay.

MR. RUDDY:  If we could just test the
equipment to make sure the volume was on.  We tried it
before.  Make sure it's on.

THE COURT:  Make sure it comes up up there,
too.

MR. RUDDY:  I think we're ready then, Your
Honor.

THE COURT:  Can we hear?  Did you want to
test the volume?

(Audio playing).

THE COURT:  It's fine.  Okay.

MR. RUDDY:  Could the witness retake the
stand?

THE COURT:  Yes, retake the stand.  Thank
you.

Mr. Martinez, anything before we start this
morning?

MR. MARTINEZ:  No, Your Honor.  We're good.
Thank you.

THE COURT:  You might want to take that off

1    the screen.

2             COURT SECURITY OFFICER:  All rise for the

3    jury.

4        (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

5             COURT SECURITY OFFICER:  Thank you, ladies

6    and gentlemen.  Please be seated.

7             THE COURT:  Good morning.

8             MEMBERS OF THE JURY:  Good morning.

9             THE COURT:  Ladies and gentlemen, anything

10   happen over the evening hours that could affect your

11   ability to serve on this jury?  Any questions or

12   concerns?  All right.

13            And I know -- listen, every time we try a

14   case in this courtroom we have the jurors complain about

15   the seats in the jury box.  And we just redid this whole

16   courtroom and those jury boxes and put those monitors in,

17   which is great -- the monitors are great.

18            But what we had to do was to put the walls

19   in front of each row, and that took up a lot of room.

20            So the results have been, especially those

21   on the top row and second row, are sort of crammed in

22   there as far as feet space or leg space is concerned.

23   And I know that some of you on the front row have

24   indicated that there is a problem.

25            And we'll do the best we can to maybe get

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   you a footrest or something like that.  That will help.

2   Or you can bring one if you want.  But we know that the

3   seats are not exactly comfortable.

4          You will recall when we recessed yesterday

5   Officer Perez from the Guatemalan Police Department was

6   on the stand.  And we'll go ahead and pick up where we

7   left off.

8          Mr. Ruddy.

9          MR. RUDDY:  Thank you, Your Honor.

10              BYRON SAJBIN PEREZ,

11  a witness, having been previously sworn to tell the

12  truth, the whole truth and nothing but the truth, was

13  examined and testified as follows:

14            CONTINUED DIRECT EXAMINATION

15  BY MR. RUDDY:

16  Q.    Mr. Perez, we're going to play just a couple more

17  tapes with you.  Starting with a tape that was recorded

18  on May 22nd -- May 25th at 7:35 in the evening.

19          MR. RUDDY:  This is Exhibit 122A, Your

20  Honor.

21          THE COURT:  Thank you.

22          (AUDIO PLAYING, EXHIBIT 122A.)

23  Q.    Officer Perez, in this phone call the person that

24  Alma Hernandez refers to here in the beginning as Tia;

25  correct?

1     A.     La Tia, the aunt, yes.

2     Q.     Was that unusual in the interceptions that you

3     did of the defendant?

4     A.     The objective at times Ecuadorians would tell

5     her, the aunt was -- would say to her the aunt, my aunt.

6     Q.     But was the defendant referred to as la Tia or

7     Tia in many of these interceptions?

8     A.     That's right.

9     Q.     How about Alma?

10     A.     Almita.

11     Q.     Now, there's also reference in the discussion at

12     the end of this recording about changing numbers.

13     A.     That's right.  In this case that we followed for

14     several months, in many occasions she would mention that

15     the numbers would be changed, and we would have to change

16     the objective.

17     Q.     Was that unusual?

18     A.     I don't believe so.  Well, the ones that we were

19     having the case, we all thought that they might be on

20     the --

21     MR. MARTINEZ:  Objection as to what they

22     might speculate.

23     THE COURT:  Sustained.

24     BY MR. RUDDY:

25     Q.     You have been in the wire room for three and a

1    half years; right?

2    A.      That's right.

3    Q.      And you have been given legal authorization to

4    intercept people that are suspected of being involved in

5    illegal activity; is that right?

6    A.      That's right, by order of the competent Judge.

7    Q.      In your experience, in the phones that you are

8    authorized to intercept, is it unusual for people

9    involved in illegal activities to change their phone

10   numbers?

11   A.      No.  This is something normal.  They do it

12   frequently.

13   Q.      And based on your experience, is there a reason

14   why people involved in illegal activity would

15   continuously change their phone numbers?

16          MR. MARTINEZ:  Objection to the form of the

17   question.  It's overbroad.

18          THE COURT:  Sustained.

19   BY MR. RUDDY:

20   Q.      Based on your experience, do you have an

21   understanding or belief as to why individuals change

22   their phone numbers so much?

23          MR. MARTINEZ:  Same objection.

24          THE COURT:  Overruled.  You can answer as

25   far as your belief.

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

1          THE WITNESS:  No.  Because by the experience

2     that we have, they try to change numbers because, as I

3     was saying, they themselves suspect that we might be

4     intercepting them.

5     BY MR. RUDDY:

6     Q.     Okay.  Now, on May 27th, two days later at 10:35

7     in the morning did you intercept another call,

8     Exhibit 128A --

9     A.     Yes.

10    Q.     -- involving the defendant?

11             MR. RUDDY:  I'd ask to publish 128A at this

12    time, Your Honor.

13             THE COURT:  You may.

14               (AUDIO PLAYING, EXHIBIT 128A)

15             MR. RUDDY:  Now, that's all for this --

16    this tape.

17    BY MR. RUDDY:

18    Q.     On -- in June the wiretap continued; right?

19    A.     That's right.

20    Q.     On June 8th did you intercept a call with the

21    defendant concerning her obtaining a passport?

22    A.     Yes.  According to the information that was being

23    generated, the objective was planning on going to the

24    immigration office to carry out the errand -- the

25    passport paperwork.

Q.      Did you alert the fiscale when you learned

that -- when you learned this information?

A.      As is normally done, all information is given to

the prosecutor, be it pertinent or not.

Q.      And on the following day, June 9th, were calls

intercepted with the defendant while she was at the

passport office?

A.      That's right.

Q.      Now, in -- later on in June did you intercept

calls with the defendant trying to obtain a Visa?

A.      That's right.

Q.      And was there a call intercepted with the

defendant wherein it was discussed with her that she

would try to obtain a letter?

A.      An invitation letter from a family member that,

according to what she indicated, was a resident in the

United States.

        MR. RUDDY:  Your Honor, could we switch to

the other --

        THE COURT:  Yes.  Document camera.

        MR. RUDDY:  Thank you, Your Honor.

BY MR. RUDDY:

Q.      And after that conversation -- or that same day,

June 17th, did the defendant make a call to the United

States?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      That's right.

2   Q.      And in that phone call did she speak with someone

3   with whom she was familiar?

4   A.      A person -- that's right.  A person who indicated

5   that she was ill.  Even more, I'm sure that it provided

6   an e-mail.

7   Q.      Who provided who an e-mail?

8   A.      Alma provided to the person who she was speaking

9   with.

10  Q.      And what was the purpose for the defendant

11  providing her e-mail address to this person in the United

12  States?

13  A.      The decision indicated is that the e-mail was

14  provided so that the person would be able to use that

15  method to send the letter.

16  Q.      To who?

17  A.      To Alma.

18          MR. RUDDY:  And this is -- for the record,

19  this is Government 146B in evidence.

20  BY MR. RUDDY:

21  Q.      Does that transcript of that phone conversation

22  on June 17th with this female in the United States

23  reflect the e-mail address?

24  A.      That's right.

25  Q.      Tia22@hotmail?

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

A.      That's right.

          MR. RUDDY:  I have no further questions of
this witness at this time.

          THE COURT:  All right.  Mr. Martinez.

          MR. MARTINEZ:  No questions.

          THE COURT:  Thank you, sir.  You may step
down.

          You may call your next witness.

          MR. RUDDY:  Yes, Your Honor.

          THE COURT:  Sir, if you'll come forward.  Do
you speak English?

          THE WITNESS:  No.

          THE COURT:  Okay.

          COURTROOM DEPUTY CLERK:  Please raise your
right hand.

          Do you solemnly swear or affirm under
penalty of perjury that the testimony you give will be
the truth, the whole truth, and nothing but the truth?

          THE WITNESS:  I do.

              JOELMIR MENDEZ ALDANA,
a witness, having been duly sworn to tell the truth, the
whole truth and nothing but the truth, was examined and
testified as follows:

          COURTROOM DEPUTY CLERK:  Please have a seat
in the witness box.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1        Please state your name and spell your last

2   name for the record.

3        THE WITNESS:  Joelmir Leonel Mendez,

4   M-E-N-D-E-Z, Aldana, A-L-D-A-N-A.

5        COURTROOM DEPUTY CLERK:  Thank you.

6        THE COURT:  Mr. Ruddy.

7        MR. RUDDY:  Yes, Your Honor.  Your Honor,

8   may I proceed?

9        THE COURT:  You may.

10        MR. RUDDY:  Okay.

11                  <u>DIRECT EXAMINATION</u>

12   BY MR. RUDDY:

13   Q.     Who do you work for sir?

14   A.     National Police of Guatemala.

15   Q.     And how long have you been employed in that

16   capacity, Officer Mendez?

17   A.     Fourteen years.

18   Q.     And you are currently assigned to what particular

19   section or unit or division of the Guatemalan National

20   Police?

21   A.     The unit is called Organization -- okay.

22   Organization Against Crimes, Against Money Laundering,

23   Drug Trafficking and Crimes of Tributary Nature.

24   Q.     Long title?

25   A.     Yes.

Q.    Okay.  How long have you worked in that unit or
that squad?

A.    Six years.

Q.    And were you working in that capacity -- in that
unit in June of 2011?

A.    That's right.

Q.    And specifically on June 9th did you conduct any
surveillance in Guatemala City in Zone -- or Zona 4?

A.    That's right.

Q.    And what time of day would that have been, sir?

A.    By instructions from the prosecutor we were at
the place at 8:30 a.m.

Q.    What place was that?

A.    It's a passport information center in Guatemala.

Q.    And what was your -- your assignment or your
responsibilities that you were to accomplish by being
there at that place at that time?

A.    By order of the special prosecutor it was to
document the moment that Alma Preciado would obtain her
passport.

Q.    And when you arrived at that location at the
passport office on the morning of June 9th, did you see
Alma Hernandez-Preciado?

A.    When we arrived to the passport information
center, we went in the place to be able to identify her.

1  In the process of delivering the passport, in a screen

2  the picture and name of the person appears when the

3  passport is going to be handed.

4        At that moment we confirmed that she was inside

5  the center of passport admissions.

6        When we had visual confirmation of the person, we

7  went out towards to the parking lot to start the process

8  of picture taking of the person.

9  Q.    So to clarify, you're in the passport office --

10       MR. MARTINEZ:  Objection to the form of the

11 question as leading.

12       THE COURT:  Sustained.

13 BY MR. RUDDY:

14 Q.    In the passport office how many aisles are there

15 for people to obtain their passports?

16 A.    There's one place where the people hand in their

17 legal documents.  When they have handed their documents,

18 they are taken to another room where their pictures are

19 taken.  Following that, they are placed in some waiting

20 chairs where their passports will be handed to them.

21 Q.    And where were you at the passport office?

22 A.    At the chairs where the passports are handed to

23 the people.

24 Q.    Now, were you -- how were you dressed?

25 A.    Black pants, long-sleeved blue shirt.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.      Were your wearing any clothing or anything
indicating that you were a member of the Guatemala
National Police?

A.      That's right.  We have our credentials that
identify us as police.

Q.      Well, was there anything -- did you identify
yourself to anyone in the passport office that you were a
member of the Guatemalan National Police?

A.      That's right, to the security personnel at the
entrance.

Q.      Did you -- did you announce to anyone publicly
that you -- that was there obtaining a passport that you
were a member of the Guatemalan National Police?

A.      That's right, to be able to enter to the place.

Q.      Okay.  Were you -- did you display -- when --
were you wearing a uniform?

A.      No.  Us investigators, we work like civil.  And
we identify ourselves with our police credentials.

Q.      To whom?

A.      In this instance to the security personnel who
identified us as national police.

Q.      To the people that were there getting passports
did you identify yourself to everyone in the room that
you were a member of the Guatemalan National Police?

A.      No.  Only to the person that's at the entrance

1    and is from security at the passport office.

2    Q.    So where do you see the name Alma

3    Hernandez-Preciado come up in the passport waiting

4    office?

5    A.    As I said, there's a screen.  In that screen

6    appears a photograph and the name of the person.  When

7    those facts appear, a person approaches, a person that

8    works within the passport office, and at that moment they

9    are handed their passport.

10   Q.    And once you saw the name Alma Hernandez-Preciado

11   come up on the screen, did you see someone go to receive

12   their passport?

13   A.    That's right, the person of Alma Preciado who was

14   at the chair seated.  And when she got up to pick up her

15   passport, we proceeded to exit so we could start with the

16   photographs.

17   Q.    Was Alma Hernandez alone when she went to the

18   passport office?

19   A.    Outside there were other people waiting.  Inside

20   it was only her.

21   Q.    These other people, did you photograph them?

22   A.    That's right.

23        MR. RUDDY:  And if I could approach the

24   witness, Your Honor?

25        THE COURT:  You may.

BY MR. RUDDY:

Q.     I'll show you what's marked for identification as Government's Exhibits 13A and 13B.  Do you recognize what those are?

A.     Yes.

Q.     They're photographs, are they not?

A.     That's right.

Q.     And who took those photographs?

A.     Myself.

Q.     What day?

A.     June 9, 2011.

Q.     And what are they photographs of?

A.     The moment that the lady exits the passport office.

MR. RUDDY:  I'd offer 13A and B.

MR. MARTINEZ:  No objection.

THE COURT:  Receive into evidence 13A and B.

(EXHIBITS 13A AND 13B ADMITTED INTO EVIDENCE.)

MR. RUDDY:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MR. RUDDY:

Q.     This is 13A.  And this photograph was taken when?

A.     June 9th.

Q.     Okay.  And when in turn to the defendant getting

1    her passport was this photograph taken?

2    A.    It was taken when the person exited the passport

3    office.

4    Q.    And the person who picked up the passport for

5    Alma Hernandez-Preciado, which one -- which one did that

6    in this photograph?

7    A.    The lady that has the blue jacket, a blue blouse,

8    blue pants who's in the middle of the photograph.

9              THE COURT:  He can also annotate or you can.

10   Is it not working?

11             THE WITNESS:  It's not working.

12             THE COURT:  There you go.  Somebody

13   annotated.

14   BY MR. RUDDY:

15   Q.    Is that Alma Hernandez-Preciado?

16   A.    That's right.

17   Q.    Do you know who any of these other people are to

18   her right or left?

19   A.    No, I don't.

20   Q.    13B, another photograph.  Is that taken June 9th?

21   A.    That's right.

22   Q.    Does it contain a photograph of Alma

23   Hernandez-Preciado?

24   A.    That's right.

25   Q.    Would that be here?

A.     That's right.

Q.     And what is she doing at the time you took this photograph?

A.     Speaking on the phone.

Q.     These other people that are here, male or female?

        THE INTERPRETER:  I'm sorry.

        MR. RUDDY:  Male or female?

        THE WITNESS:  Females.

BY MR. RUDDY:

Q.     And the vehicle, what type of vehicle was it?

A.     It was a pickup.  The make was Isuzu D-Max.

Q.     Did you get the license plate number?

A.     That's right.

Q.     And who was it registered to?

A.     It was a company by the name of Far Market.

Q.     I'm sorry?

A.     It's a company.  And name is Far Market.

        THE COURT:  We couldn't get that.  Are you saying far, F-A-R?

        I'm asking the interpreter.  We couldn't understand you.

        THE INTERPRETER:  I'm sorry.  Yes, far.  Far Market.

        THE COURT:  Thank you.

BY MR. RUDDY:

1    Q.     What was your understanding of why you needed to

2    have this photograph of Alma Hernandez-Preciado?

3    A.     According to instructions by the lead prosecutor

4    of the unit --

5              MR. MARTINEZ:  Objection as to what the lead

6    prosecutor told him.

7              THE COURT:  The question is what is your

8    understanding.

9              THE WITNESS:  As I said, by orders of our

10   boss --

11             MR. MARTINEZ:  Objection as to what the boss

12   told him.

13   BY MR. RUDDY:

14   Q.     Not who told you anything, but what was your

15   understanding why you were taking a photograph of Alma

16   Hernandez?

17             MR. MARTINEZ:  Before the witness answers

18   the question, I'd ask that the government establish a

19   predicate for knowledge because I think we're going to

20   end up getting the same thing.

21             THE COURT:  Well, I don't think he needs to

22   establish a predicate for his understanding.  Let's try

23   it and see what we get.

24   BY MR. RUDDY:

25   Q.     Did you -- yes or no, did you have an

1  understanding why you were there to take this photograph

2  of Alma Hernandez-Preciado on June 9th?

3  A.    No.

4  Q.    Okay.  All right.

5          MR. RUDDY:  No further questions.

6          THE COURT:  Mr. Martinez?

7          MR. MARTINEZ:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9  BY MR. MARTINEZ:

10  Q.    Good morning, Officer Aldana.

11  A.    Good morning.

12  Q.    The investigation into Miss Hernandez began on

13  what date?

14  A.    In Guatemala the cases are held only by the

15  prosecutor.  The date of the case only the prosecutor

16  knows it.

17  Q.    When was the first date that you as an officer in

18  the Guatemalan Police Department began work on the case?

19  A.    It was June 9th when it was ordered to document

20  the moment that Miss Alma Preciado was obtaining her

21  passport.

22  Q.    Was Miss Hernandez followed from her home to the

23  passport office?

24  A.    No.

25  Q.    Do you know who arrived with -- if anyone did

1    arrive with Miss Hernandez when she arrived at the

2    passport office?

3    A.    I don't understand.

4    Q.    Were you -- was Miss Hernandez under surveillance

5    when she arrived at the passport agency?

6    A.    The surveillance was from our behalf, not from

7    another group.

8    Q.    No.  I understand.

9          Your surveillance, did you see her arrive in the

10    parking lot of the passport office?

11    A.    No.

12    Q.    You only saw her for the first time when her

13    picture came up in the waiting room of the passport

14    office?

15    A.    That's right.

16    Q.    Okay.  And when she left the passport office, did

17    she leave in the red truck?

18    A.    That's right.

19    Q.    And did you follow her as to where she went after

20    that?

21    A.    No.

22    Q.    So as soon as she got in the car and started to

23    drive away, you stopped the surveillance?

24    A.    That's right.

25    Q.    So your entire surveillance of Miss Hernandez is

1    limited to her being called up at the passport office and

2    then getting into the red truck and leaving?

3    A.    That's right.

4    Q.    You testified on direct that the vehicle that she

5    departed in was registered to Far Market.

6    A.    That's right.

7    Q.    Who are the owners of that business, Far Market?

8    A.    I don't know.

9    Q.    Did you look?

10   A.    According to the reports that were presented to

11   the prosecutor, we only document the owner of the

12   vehicle.

13   Q.    That's my question.

14         Who is the individual owner of the vehicle?  Is

15   that a name of a person, Far Market?

16   A.    It's a company.  It's a business.

17   Q.    Who's the owner of the business?

18   A.    I don't know.

19   Q.    Did you check?

20   A.    By our police controls it appears that the

21   vehicle is owned by that company.

22   Q.    I want to know if you bothered to check and see

23   who is the person that owns the company.

24   A.    No.  It is done only if the prosecutor requires

25   it.

```
1   Q.    And did the prosecutor ask you to check into

2   that?

3   A.    No.

4              MR. MARTINEZ:  No further questions.

5              THE COURT:  Mr. Ruddy, any redirect?

6              MR. RUDDY:  No, Your Honor.

7              THE COURT:  Thank you, sir.  You may step

8   down.

9              Is your next witness in custody?  Is he up

10  here or down there?  Is he up here?

11             DEPUTY U.S. MARSHAL:  I believe he's here,

12  Your Honor.

13             THE COURT:  I'm just trying to decide

14  whether to take a recess.

15             THE INTERPRETER:  The interpreter would

16  appreciate that, Your Honor.

17             THE COURT:  What?

18             THE INTERPRETER:  The interpreter would

19  appreciate a break right now.

20             THE COURT:  I can't understand you.

21             THE INTERPRETER:  The interpreter would

22  appreciate a break right now.

23             THE COURT:  All right.  Then let's take a

24  brief recess.  Ladies and gentlemen, we'll be in recess

25  till about I guess -- I'm sorry, 10:17.  You're welcome
```

1    to walk around.  Please don't discuss the case.

2                   COURT SECURITY OFFICER:  All rise for the

3    jury.

4                   THE COURT:  I'm sorry.  We're going to take

5    a recess.  10:17.

6        (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

7                   THE COURT:  Okay.  We'll start again at

8    10:17.

9    (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

10                   CONTINUED AS FOLLOWS:)

11                   COURT SECURITY OFFICER:  All rise, please,

12   for the Court.  This Honorable Court is again in session.

13   Please be seated.  Come to order.

14                   THE COURT:  That would be great if the

15   interpreters could -- I'm sure Mr. Marino would

16   appreciate that because we're going to have I think

17   almost exclusively Spanish speaking people for a while.

18                   MR. RUDDY:  For probably the next day.

19                   THE COURT:  Yeah.  So, yes, just let me know

20   when you want to switch and that will be great.

21                   THE INTERPRETER:  I really appreciate that.

22                   THE COURT:  Thank you, all.

23                   Marshals want to get our next witness out?

24                   U.S. MARSHAL:  Yes, Your Honor.

25                   MR. MARTINEZ:  Judge, there's one matter

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    before we bring the next witness out.  I understand is an

2    in custody cooperating witness who is the husband of

3    Miss Hernandez.

4              He will -- Mr. Ruddy advised me during the

5    break that one of the things that he will be testifying

6    to is a conversation that he had with Miss Hernandez

7    where in the course of that conversation she conceded to

8    him that she had been previously convicted of a drug

9    trafficking offense in Guatemala, sentenced to ten years

10   and served seven.  We received in discovery information

11   regarding the documentation regarding that prior

12   conviction.

13             We were never noticed that it was the

14   government's intention to introduction that conviction in

15   their case in chief as 404(b) evidence.  And it's not

16   being offered here as 404(b) evidence.  It's being

17   offered her as an admission.  I think it's the functional

18   equivalent of the introduction of 404(b) evidence.  So I

19   wanted to get my objection noted to that before the

20   witness testified so that the record would at least

21   reflect my objection.

22             THE COURT:  Okay.  Of course, I'm not sure

23   why it matters a whole lot because you've indicated she's

24   going to take the stand and testify.  You can certainly

25   ask her about it at that particular moment in time.

1          MR. MARTINEZ:  And at that juncture I think

2   it would be appropriate.  I just don't think it's

3   appropriate now.  If for some reason she decided not to

4   testify, then that future event would never occur.

5          THE COURT:  Okay.  But -- and -- and I

6   would -- I would think about this a little more if you

7   had not represented to the jury that she was going to

8   testify and going to tell her story and all that kind of

9   thing.

10          MR. MARTINEZ:  Quite frankly, Your Honor, to

11  be candid with the Court, we haven't changed our position

12  on that.  We expect that she will.  And I expect that it

13  will be somewhat academic because -- but I thought

14  nonetheless I should preserve the objection.

15          THE COURT:  All right.  And, Mr. Ruddy, you

16  are going to ask this witness those questions regarding a

17  prior conviction; is that correct?

18          MR. RUDDY:  Yes, Your Honor.  This was in

19  the process of them -- first of all, they're not married

20  legally.  It's common law.  And this would be in the

21  course of him explaining that's how he came to know

22  her -- came to know each other and became involved in the

23  drug business.

24          THE COURT:  Okay.

25          MR. RUDDY:  It was during that course in

```
1    time that the defendant advised this witness, Mr. Lara,
2    that she had been convicted -- arrested and convicted for
3    drug offenses and served a seven to ten-year sentence.
4               THE COURT:  Okay.  All right.  Well, then
5    I'll note the objection but I'm going to overrule the
6    objection.  I think it's admission as well.
7               If you'll bring the witness in.
8               Sir, if you will have a seat in the witness
9    chair.
10              MR. RUDDY:  Your Honor, may I speak with
11   this witness for a brief moment?
12              THE COURT:  Before we start?  Yeah.
13                  (PAUSE IN PROCEEDING.)
14              MR. RUDDY:  Thank you, Your Honor.
15              THE COURT:  All right.  Let's bring the jury
16   in, please.
17              COURT SECURITY OFFICER:  Yes, Your Honor.
18                  (PAUSE IN PROCEEDING.)
19              THE COURT:  Mr. Ruddy, could you push the
20   screen down a little bit so the jury can see this
21   witness.  Take the top of it and just push it down just
22   like that.  And he can pull it up if he needs to.  That
23   way the jury can see him.
24              COURT SECURITY OFFICER:  All rise, please,
25   for the jury.
```

```
 1          (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

 2                COURT SECURITY OFFICER:  Thank you, ladies

 3   and gentlemen.  Please be seated.

 4                THE COURT:  Mr. Ruddy, you may call your

 5   next witness.

 6                MR. RUDDY:  Thank you, Your Honor.  The

 7   government calls Miguel Angel Lara.

 8                COURTROOM DEPUTY CLERK:  Please stand and

 9   raise your right hand.

10                Do you solemnly swear or affirm under

11   penalty of perjury that the testimony you shall give will

12   be the truth, the whole truth, and nothing but the truth?

13                THE WITNESS:  I do.

14                          MIGUEL LARA,

15   a witness, having been duly sworn to tell the truth, the

16   whole truth and nothing but the truth, was examined and

17   testified as follows:

18                COURTROOM DEPUTY CLERK:  Please have a seat

19   in the witness box.

20                Please state your name and spell your last

21   name for the record.

22                THE WITNESS:  My name is Miguel Angel Lara,

23   L-A-R-A.

24                THE COURT:  Thank you.

25                       DIRECT EXAMINATION
```

BY MR. RUDDY:

Q.     Mr. Lara, how old are you?

A.     Thirty-eight.

          THE COURT:  Okay.  Would the interpreter tell him to face the jury.  Turn his chair around.  Thank you, sir.  Thank you.

BY MR. RUDDY:

Q.     Thirty-eight years?

A.     That's right.

Q.     And where are you from?

A.     I am originally from Guatemala.

Q.     Born there?

A.     Yes, sir.

Q.     What town or city?

A.     It's a town called Los Amates, A-M-A-T-E-S, Izabal, I-Z-A-B-A-L, which is in the Atlantic coast of Guatemala.

Q.     And did you go to school?

A.     Yes.

Q.     How far did you go to school?

A.     Ninth year.

Q.     Do you read and write Spanish?

A.     Yes, sir.

Q.     Did you -- well, you're in prison here in the United States; correct?

A.     Yes, sir.

Q.     How did you end up there?

A.     The date of 18 of May, 2011, I was sent by the same person who lived with me to a certain direction in the sea.

Q.     To do what?

A.     To pick up a cocaine load.

Q.     Did you do that?

A.     Yes, sir.

Q.     What happened after you picked up the cocaine?

A.     I was detained by the United States Coast Guard. Following that I was brought here to Tampa, Florida, and here I am.

Q.     And you're currently in prison?

A.     Yes, sir.

Q.     And what sentence are you serving?

A.     A hundred ninety-two months, to the equivalent of 16 years in jail.

Q.     Exactly 16 years; correct?

A.     Yes, sir.

Q.     Okay.  You said someone sent you out to the sea to pick up this cocaine.  Who was that?

A.     I mentioned that it was the person who lived with me.  And her name is Alma Lucrecia Hernandez-Preciado.

Q.     Is she here today?

1    A.    I have not seen her.

2    Q.    Would you look around the courtroom.

3    A.    I don't see her.

4    Q.    Mr. Lara, that's Government Exhibit 13A.  Who's

5    that a picture of?

6          MR. MARTINEZ:  Objection, it's been asked

7    and answered.

8          THE COURT:  Overruled.

9          THE WITNESS:  The lady who's here in the

10   middle?

11   BY MR. RUDDY:

12   Q.    Yes, si.

13   A.    It's her.

14   Q.    Who's her?

15   A.    Alma Lucrecia Hernandez-Preciado.

16   Q.    Is this the woman that we're talking about?

17   A.    Yes, sir.

18   Q.    Okay.  And you said you lived with this woman?

19   A.    Yes, sir.

20   Q.    For how long?

21   A.    For seven years interrupted.

22          MR. RUDDY:  May I approach the witness and

23   move that panel down?

24          THE COURT:  Sure.

25   BY MR. RUDDY:

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    Q.     I'm sorry?  When did you -- how long did you live
 2    with her?
 3              MR. MARTINEZ:  Objection, Your Honor, as to
 4    the continued questions.  He has not identified the
 5    defendant as being in the courtroom.
 6              THE COURT:  Overruled.  He's talking about
 7    who he lived with, so overruled.
 8              THE WITNESS:  Can I answer?
 9    BY MR. RUDDY:
10    Q.     Yes.
11    A.     I mentioned seven years.
12    Q.     And where -- how did you meet Alma
13    Hernandez-Preciado?
14    A.     I met her through a friend.
15    Q.     What year was that?
16    A.     2002.
17    Q.     Where did you meet her?
18    A.     In the house she habitates in the City of -- the
19    city is Tecun Uman, T-E-C-U-N, U-M-A-N.
20    Q.     And what country is that in?
21    A.     In Guatemala, Central America.
22    Q.     And where is it in Guatemala, south or east,
23    north, central part?  What part of Guatemala is this town
24    in?
25    A.     South coast of Guatemala.
```

```
1    Q.      Is it near Mexico?

2    A.      Yes, on the border between Guatemala and Mexico.

3    Q.      And after you met Alma Hernandez-Preciado, did

4    you develop a relationship with her?

5    A.      Yes, sir.

6    Q.      And what kind of relationship?

7    A.      Sentimental.

8    Q.      And did you at some point in time live with her?

9    A.      Yes, sir.

10   Q.      And did you learn her background?

11   A.      We conversed on certain occasions.  She commented

12   to me that she had had a drug problem in our country.

13   Q.      Guatemala?

14   A.      Yes, sir.

15   Q.      When?

16   A.      I don't know in what year it was, because back

17   then I didn't know her yet.

18   Q.      What kind of problem?

19   A.      She commented that it had been because of drug

20   problems.  She said she had been detained because of this

21   drug problem, and that she had been sentenced to ten

22   years and that she served seven.

23   Q.      Now, at the time you began developing your

24   relationship with Alma Hernandez-Preciado, were you

25   employed?
```

```
 1    A.      I still worked for the national police in
 2  Guatemala.
 3    Q.      And did you learn at some point that Alma
 4  Hernandez during the time you were beginning to know her
 5  was involved in illegal activity?
 6    A.      Yes.
 7    Q.      How did you learn that?
 8    A.      By way of the friend who introduced her to me who
 9  had friendships with her family.
10    Q.      Her family?
11    A.      Had friendships with her family.
12    Q.      Well, did -- and what did you come to learn was
13  the level of drug activity that Alma Hernandez-Preciado
14  was involved with?
15          MR. MARTINEZ:  Objection if it's the hearsay
16  statement told to him.
17          THE COURT:  Sustained.
18  BY MR. RUDDY:
19    Q.      Did you have personal conversation with Alma
20  about her drug activity?
21    A.      The problem that she had when she was sentenced
22  in Guatemala, I don't know how that came to happen.
23    Q.      All right.  Well, we're talking about the time
24  when you knew her.  Was she involved in drug trafficking
25  during the time you knew her?
```

1    A.      Yes, sir.

2    Q.      When did you first become aware that Alma

3    Hernandez was involved in drug trafficking when you knew

4    her?

5    A.      It was when she sent a certain amount of drugs to

6    a jail.

7    Q.      Okay.  And how did you --  how do you know this?

8    A.      Because I was there at the house when she [sic]

9    lived with her.

10   Q.      And how much drugs were sent to the jail?

11   A.      I don't know the quantity, but it was a small

12   quantity.

13   Q.      Small meaning a gram, an ounce, ten kilos?

14   A.      Could be two, three ounces.

15   Q.      An ounce is 28 grams?

16   A.      I believe, yes, that's right.

17   Q.      Now, what jail was this three ounces or a couple

18   three ounces of cocaine -- what jail was this being sent

19   to?

20           MR. MARTINEZ:  Objection as to the continued

21   relevance.

22           THE COURT:  Overruled.

23           THE WITNESS:  The name of this jail is

24   Granja Penales de Canadá Escuintla in Guatemala.

25   BY MR. RUDDY:

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      And did you learn how often Alma

2   Hernandez-Preciado was sending cocaine to the -- to the

3   jail there?

4   A.      In occasions might have been one time.  Could

5   have been in occasions every four to six months.

6   Q.      Did you ever become involved in Alma's drug

7   trafficking activity?

8   A.      No.

9   Q.      Never?

10  A.      Referring to what was sent to the jail, no.

11  Q.      Did you learn through Alma who was receiving the

12  drugs in the jail that was sent by Alma?

13  A.      Yes, sir.

14  Q.      Who?

15  A.      Was received by a man who said -- who was

16  Mexican.  Said his name was Jorge Grijalva.

17  Q.      Could you spell the last name.

18  A.      G-R-I-G-A-L-V-A.

19  Q.      Grijalva?

20  A.      Yes, sir.

21  Q.      Did you ever meet this person?

22  A.      No.

23  Q.      How do you know he was the one receiving the

24  drugs in the jail?

25  A.      Because there would be calls by the telephone.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Q.      By whom?

2  A.      Mr. Jorge would call Alma by phone.

3  Q.      And would you overhear Alma's side of the

4  conversation?

5  A.      A small part yes.

6  Q.      And so again, how is it that you knew that

7  Mr. Grijalva from the jail was calling Alma about drugs?

8  A.      Because when Alma told me she was going to send a

9  small amount of drugs to the jail, I asked her who.  And

10  she told me Mr. Grijalva, the Mexican man detained.

11  Q.      Did Alma have a drug relationship with any other

12  people in the jail?

13  A.      Only with him, I believe.

14  Q.      Do you know a man by the name of William Valela?

15  A.      I did not meet him.  Mr. Grijalva is the one who

16  knew him.

17  Q.      You heard of him?

18  A.      Yes, sir.

19  Q.      So you never talked to Mr. Valela, but you know

20  that he knows Mr. Grijalva; right?

21  A.      Yes, sir.

22  Q.      Did you ever talk to Mr. Grijalva?

23  A.      No.

24  Q.      How do you know that Mr. Valela knows

25  Mr. Grijalva if you spoke to neither one of them?

1    A.    Because Mr. Grijalva spoke with Alma, told her I

2    have a friend who's from Ecuador who brings illegals to

3    national waters of Guatemala.  And I can make the contact

4    with him so you may talk about the businesses that you

5    all have.

6    Q.    Did you hear Mr. Grijalva tell Alma Hernandez

7    this?

8    A.    I heard small portion of a conversation.  She

9    also commented to me.

10   Q.    She being who?

11   A.    Doña Alma Hernandez-Preciado.

12   Q.    And Doña Alma, you said you lived with her for --

13   how many years did you live with her?

14   A.    Seven years.

15   Q.    But you refer to her as Doña?

16   A.    Yes, sir.

17   Q.    Isn't that a sign of respect --

18   A.    Yes, sir.

19   Q.    -- for someone you're not very familiar with?

20   A.    Exactly, yes.

21   Q.    Or afraid of?

22   A.    Yes, sir.

23   Q.    Doña Alma here today?

24   A.    I don't see her.

25   Q.    Okay.  Let's talk more about Doña Alma

```
 1   Hernandez-Preciado that you lived with for seven years.
 2   You -- after Alma Hernandez-Preciado told you about this
 3   Grijalva --
 4            MR. MARTINEZ:  Objection to the form of the
 5   questions, leading.
 6            THE COURT:  Sustained.
 7   BY MR. RUDDY:
 8   Q.    Did you come to know whether Alma
 9   Hernandez-Preciado had any dealings with Mr. Valela?
10   A.    I cannot say because these are things that only
11   she feels.  And what she feels I don't --
12   Q.    Did she tell you whether she had any contact with
13   Mr. Valela?
14   A.    With Mr. Valela?
15   Q.    Yes.
16   A.    Yes.
17   Q.    Where?
18   A.    I don't remember the year.  Mr. Jorge Grijalva
19   gave her a phone number so that she could get in touch
20   with Mr. Valela.
21   Q.    She being who?
22   A.    Doña Alma Preciado.
23   Q.    How did you come to know this?
24   A.    She commented to me.
25   Q.    Alma Hernandez?
```

1   A.      Yes, sir.

2   Q.      And did Alma Hernandez contact Mr. Valela?

3   A.      Yes, sir.

4   Q.      How do you know this?

5   A.      Because she commented to me.

6   Q.      Alma Hernandez?

7   A.      Yes, sir.

8   Q.      And did Alma Hernandez tell you what she talked

9   about with Mr. Valela?

10  A.      Yes, sir.

11  Q.      What?

12  A.      That she had spoken with him by phone, asked her

13  to travel to the Republic of Ecuador.

14  Q.      For what reason?

15  A.      Because they were going to meet to talk about

16  what they had spoken about.

17  Q.      What was that?

18  A.      About the drug businesses.

19  Q.      And who told you that Alma and Mr. Valela were

20  going to meet and talk about the drug businesses?

21  A.      Doña Alma.

22  Q.      Doña Alma?

23  A.      Yes, sir.

24  Q.      So did Alma Hernandez go to Ecuador?

25  A.      Yes, sir.

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Did you go?

2    A.    No, I did not go.

3    Q.    How long was she gone?

4    A.    I don't remember how many days, but the space of

5    one week.

6    Q.    When Alma Hernandez returned, did she tell you

7    what had happened during her trip to Ecuador?

8    A.    Yes, sir.

9    Q.    What did she tell you?

10   A.    That they had met with Mr. Valela and that they

11   had spoken about the businesses.

12   Q.    What business?

13   A.    Drug business.

14   Q.    All right.  Did she give you any more detail?

15   A.    That within some time a shipment would be made.

16   Q.    From where to where?

17   A.    From the Republic of Ecuador towards Guatemalan

18   waters.

19   Q.    And how would the -- what kind of drugs would be

20   shipped from Ecuador to the waters of Guatemala?

21   A.    Cocaine.

22   Q.    In what quantities?

23   A.    Between 20 and 45 and 90 kilos of cocaine.

24   Q.    And how were the drugs going to be sent from

25   Ecuador to the waters off the coast of Guatemala?

1    A.    By means of vessels.

2    Q.    Did -- and who told you this?

3    A.    Doña Alma -- Alma told me.

4    Q.    Did you -- well, you said they went to Ecuador.

5    Who went with Alma to Ecuador?

6    A.    She went by herself, alone.

7    Q.    So when you said earlier that they went to

8    Ecuador and they spoke with William Valela, was that

9    wrong?

10   A.    Yes.  I was mistaken.  Pardon me.

11   Q.    So one person went to Ecuador?

12   A.    Yes, sir.

13   Q.    Who was that?

14   A.    Doña Alma Hernandez-Preciado.

15   Q.    And did Alma Hernandez explain to you what was

16   going to happen with the drugs once they were received by

17   her in Guatemala?

18   A.    Yes.

19   Q.    What did she tell you?

20   A.    That she was going to sell them.

21   Q.    Where?

22   A.    Right there in the city of Tecun Uman, Guatemala,

23   on the border with Mexico.

24   Q.    Did she indicate who she was going to sell the

25   drugs to?

1    A.    Not at that point.

2    Q.    Well, at some point did she tell you who she was

3    going to sell the drugs to?

4    A.    Yes.

5    Q.    Who?

6    A.    To Mr. Carlos Enriques Sapon Castillo.

7    Q.    Okay.  And do you know this man?

8    A.    Yes, sir.

9    Q.    Does Alma --  was Alma in the drug business with

10   Mr. Sapon?

11   A.    Yes, sir.

12   Q.    What nationality is Mr. Sapon?

13   A.    Guatemalan.

14   Q.    Did Alma describe to you the plan to receive

15   these drugs that were shipped from Ecuador?

16   A.    Yes, the one that was captured, yes, the one in

17   which I was detained.

18   Q.    Well, let's go back to the first one.  Right

19   after the trip that Alma Hernandez took to Ecuador when

20   Alma Hernandez is telling you all these plans she has,

21   was there a plan devised to receive the drugs that were

22   being shipped from Ecuador?

23   A.    Yes, sir.

24   Q.    All right.  What did she tell you?

25   A.    We're going to buy a launch.

1    Q.    Who's "we"?

2    A.    Well, I was referring to what she was telling me.

3    Q.    All right.  Well, who was she referring to when

4    she said "we"?

5    A.    She was taking me into account because I was

6    living with her.

7    Q.    That you and Alma were going to buy a small boat?

8    A.    Yes, sir.

9    Q.    To do what?

10   A.    Well, to go and take -- or go to a certain

11   coordinate on the sea.

12   Q.    And do what?

13   A.    To pick up the amount of cocaine that they were

14   sending to her.

15   Q.    So did you go buy a small boat?

16   A.    Yes.

17   Q.    Who bought it?

18   A.    Doña Alma bought it.  I didn't put not one red

19   cent.  I had no money.

20   Q.    Well, how did -- where did Alma Hernandez get the

21   money to buy this boat?

22   A.    Well she had it.  I couldn't tell you where she

23   got it.

24   Q.    Was she working?

25   A.    Well, selling small quantities of drugs, yes.

1    Q.    And that was the only job she had?

2    A.    Yes, sir.

3    Q.    So she bought the boat.  Do you know how much she

4    paid for it?

5              THE INTERPRETER:  What she paid for it?

6    BY MR. RUDDY:

7    Q.    Do you know how much she paid for it?

8    A.    It was around 20,000 Mexican pesos.

9    Q.    How does that translate to dollars U.S.?

10   A.    At this point I couldn't tell you because I

11   couldn't figure out exactly what it would be equivalent

12   to.

13   Q.    What else did she buy other than the boat?

14   A.    Two Yamaha engines, Model 75.  Pardon me.  75 is

15   the number of the motor.  The model I couldn't tell you.

16   Q.    Would 75 be the horsepower?

17   A.    Perhaps, but I couldn't say because I have no

18   experience with engines.

19   Q.    So she bought those too?

20   A.    Yes, sir.

21   Q.    And did she buy any electronic equipment?

22   A.    Yes, sir.

23   Q.    Like a satellite phone?

24   A.    Exactly.

25   Q.    Tell us why Alma Hernandez would need to buy a

1   satellite phone.

2   A.      Well, that telephone was going to be given to me,

3   and I was going to take it on the boat to the coordinates

4   were on the water where we were going to receive the

5   cocaine, and then after that I would call the other boat.

6   Q.      What other boat?

7   A.      Well, the one that would come from South America

8   from the Republic of Ecuador.

9   Q.      And did Alma explain why you need a satellite

10  phone as -- rather than a regular cell phone for this?

11  A.      Yes.

12  Q.      Why?

13  A.      Well, because the coordinates on the waters where

14  we were going to take delivery a normal phone, a personal

15  phone, which is what you would use on land, would not

16  receive a signal.

17  Q.      So you would -- strike that.

18          How about a GPS device, global positioning

19  device?

20  A.      Well, the GPS is good on these trips in order to

21  enter the coordinates as we call them.

22  Q.      And why is that important?

23  A.      Well, because this small device will direct you

24  to the coordinates where the delivery is to be made.

25  Q.      Now, did you pay for the GPS device?

```
1    A.      At no time.

2    Q.      How about the satellite phone?

3    A.      Well, the satellite phone is used -- or is good

4    to be able to call the place where one has to go, the

5    coordinates on the waters, because it's powerful enough

6    to receive a call.

7    Q.      Okay.  Whose idea was it to purchase these

8    things?

9    A.      Doña Alma's.

10   Q.      And what was the plan?  Who was going to go out

11   on the water and receive these drugs?

12   A.      I was going to.

13   Q.      Who decided that?

14   A.      Doña Alma decided.

15   Q.      And were you going alone?

16   A.      There were two other colleagues.

17   Q.      Okay.  What were the names of your colleagues?

18   A.      Jorge Cameras De Leon, who was the captain of the

19   boat, and Jose Antonio Mijangos Trinidad.

20   Q.      Some people call him Tono?

21   A.      Antonio Mijangos.  Because I call him Tono as

22   well.

23   Q.      And who decided that Mr. Cameras and Mr. Mijangos

24   would be going on this trip?

25   A.      Doña Alma Preciado.
```

1  Q.     And prior to Alma Preciado telling you you were

2  going to go on this trip, did she ask you if you were

3  going on the trip?

4  A.     Yes, she asked me.

5  Q.     Did you agree?

6  A.     I told her yes.

7  Q.     How about Mr. Cameras?

8  A.     She also asked him if he wanted to go, and he

9  said yes.

10 Q.     And Mr. Mijangos?

11 A.     The same thing.

12 Q.     And we're talking about the first trip you ever

13 took to receive drugs on the water?

14 A.     No.  We're talking about this one which I was

15 detained.

16 Q.     On May 18th?

17 A.     Yes.  That was when we were detained.

18 Q.     Let's talk about the first trip you went on.

19 We'll get to your last one.  May be next week, but we'll

20 get to it.

21        The first trip you went on with, who decided who

22 was going to go?

23 A.     It was Doña Alma Preciado made that decision.

24 Q.     Okay.  And who -- who -- who bought the boat to

25 go out there?

1   A.      Doña Alma.

2   Q.      And the rest of the supplies?

3   A.      Yes, she bought them.

4   Q.      With what money?

5   A.      With her own money.

6   Q.      From what?

7   A.      From drugs.

8   Q.      From drugs.

9           Because she never worked, did she?

10  A.      Not that I know of.

11  Q.      Other than selling drugs?

12  A.      Yes, sir.

13  Q.      Now, on the first trip, who went with you?

14  A.      Jorge De Leon came.

15  Q.      Who else?

16  A.      Alfredo Marroquin went.

17  Q.      All right.  Who else?

18  A.      And me.  There were three of us.

19  Q.      All right.  Who told you to go?

20  A.      Doña Alma Preciado.

21  Q.      All right.  Did you get paid?

22  A.      Yes, sir.

23  Q.      How much?

24  A.      Three thousand quetzals, the national currency of

25          Guatemala.

1    Q.      And how many dollars is that US?

2    A.      Approximately $400.

3    Q.      And Alma paid you that money?

4    A.      Yes, sir.

5    Q.      How about the other two, who paid them?

6    A.      Doña Alma.

7    Q.      So Mr. De Leon, he was what -- what role did he

8    play on the vessel?

9    A.      The captain of the boat.

10   Q.      And you did what?

11   A.      I was in charge of receiving the drugs.

12   Q.      You were responsible?

13   A.      Yes, sir.

14   Q.      How much drugs did you receive the first time --

15   first one?

16   A.      Twenty kilos of cocaine.

17   Q.      And what did you do with this?

18   A.      Well, we received it on the waters.  We returned

19   to land and turned it over to Doña Alma.

20   Q.      What about the next trip, how much cocaine did

21   you pick up on that trip?

22   A.      I remember it was 35 kilos.

23   Q.      Who went on that trip?

24   A.      Jorge De Leon, Alfredo Marroquin, me and Miguel

25   Lara.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    Q.      You are Miguel Lara?
 2            THE INTERPRETER:  No.  That's the
 3    interpreter's --
 4            MR. RUDDY:  Okay.
 5    BY MR. RUDDY:
 6    Q.      So how much were you paid for that trip?
 7    A.      Three thousand dollars exactly.
 8    Q.      Who paid you?
 9    A.      Doña Alma.
10    Q.      What did you do with the drugs?
11    A.      They were delivered to her.
12    Q.      By who?
13    A.      It was delivered by a gentleman who came from
14    South America on the other boat.
15    Q.      Okay.  And how much was it?
16    A.      Thirty-five kilos of cocaine.
17    Q.      When was the next trip?
18    A.      Well, it was 60 -- pardon me, 90 kilos of
19    cocaine.
20    Q.      Okay.  When was that trip?
21    A.      That was a third trip.
22    Q.      And who went on that trip?
23    A.      Jorge De Leon, Alfredo Marroquin, Miguel Lara,
24    me.
25    Q.      And how much did you pick up on this trip?
```

1    A.    It was 90 kilos of cocaine.

2    Q.    And who did you do this trip for?

3    A.    It was also for Doña Alma Preciado.

4    Q.    And what -- what did you once you picked up the

5 drugs, who did you deliver them to?

6    A.    Delivered to Doña Alma.

7    Q.    Now, did Doña Alma have anyone helping her when

8 she received these drugs, yes or no?

9    A.    Yes.

10    Q.    Who?

11    A.    On occasions her brother was with her.

12    Q.    Who's that?

13    A.    Jorge Preciado.

14    Q.    All right.  Who else?

15    A.    Only that.

16    Q.    The two of them?

17    A.    Yes.

18    Q.    Nobody else?

19    A.    Pardon me.  Another occasion also there was a man

20 Fernando Osorio.

21    Q.    Were you paid money for this load with the

22 90 kilos?

23    A.    Yes, sir.

24    Q.    How much were you paid and by whom?

25    A.    Three thousand dollars exactly.  And I was paid

1    by Doña Alma.

2    Q.    When was the next trip?

3    A.    It was a trip within the waters.  I believe it

4    was a fourth trip.

5    Q.    How much?

6    A.    On that occasion the quantity of 390 kilos of

7    cocaine were received.

8    Q.    Who went on that trip?

9    A.    Myself, Jorge De Leon, Fernando Osorio, Miguel

10   Lara.  That's me.

11   Q.    And who paid you for that trip?

12   A.    Also Doña Alma.

13   Q.    How much?

14   A.    Three thousand dollars exactly.

15   Q.    Who received the drugs when you brought them back

16   to Guatemala?

17   A.    They were received by Doña Alma Preciado.

18   Q.    Alone?

19   A.    She was there.  I was there.  And also the man --

20   men who were in charge that came I suppose from South

21   America because I don't know where they departed from.

22   Q.    Well, the people -- wait a minute.  The people

23   from South America, did you receive anything but the

24   drugs when you met the vessel out in the water?

25   A.    I did not receive it because two men in charge of

1    the cocaine came, but I did not receive it.

2    Q.    Did you -- talking about the load, the 390 kilos.

3    A.    Yes, sir.

4    Q.    Did you go out in the water and receive those

5    drugs?

6    A.    Yes, sir.

7    Q.    And was that your responsibility to make sure

8    those drugs got delivered to Alma?

9    A.    Yes, sir.

10    Q.    That's why she's paying you; right?

11    A.    Yes, sir.

12    Q.    So when the drugs, 390 kilos, were transferred to

13    you on the water, did anyone else come on your boat?

14    A.    Yes, sir.

15    Q.    Who?

16    A.    It was two men.  One of them said his name was

17    Larry Molina.  Colombian citizenship.

18    Q.    Did you know him by any other names?

19    A.    No.

20    Q.    And why was he -- do you know why he was going

21    with you and the drugs?

22    A.    Yes, sir.

23    Q.    Tell us.

24    A.    Because he was in charge.  He was on the vessel

25    in charge of the drugs.

Q.    All right.  So when you delivered the drugs to
Alma Hernandez-Preciado in Guatemala, who was there to
receive them?

A.    Alma was there, myself, Larry Molina.

Q.    He came from the boat from Ecuador.  So who was
there from Guatemala other than Alma?

A.    Myself and her brother, Jorge.

Q.    Nobody else?

A.    Also the other man that came from the vessel from
South America.

Q.    So two people, Alma and her brother, receive
39Ø kilos, which is over 8ØØ pounds; right?

A.    Yes.

Q.    What's the next trip you went on for Alma
Preciado?

A.    One day arriving to the same place on the sea.
On that occasion we came back empty-handed because the
vessel had jettisoned the load since the DEA plane flew
over them.

Q.    Who went out on this trip?

A.    Mr. Antonio Mijangos, Jorge Cameras De Leon,
Miguel Lara, myself.

Q.    And who sent the three of you out on this trip?

A.    Doña Alma Preciado.

Q.    But on this trip you didn't bring back anything?

1    A.    Yes, sir.

2    Q.    Yes, you did or no, you -- yes, you did -- did

3    you bring back anything?

4    A.    No.

5    Q.    And was this the first time that you had gone on

6    a trip out in the water to receive drugs and came back

7    empty-handed?

8    A.    Yes, sir.

9    Q.    And the location where you would go out in the

10   water to receive the drugs, do you recall the

11   coordinates?

12   A.    I don't remember because I did not manage that;

13   the captain did.

14   Q.    Did you -- how long before your arrest was this

15   trip where you went back, but you didn't -- you came back

16   empty-handed?

17   A.    Approximately some five months.

18   Q.    And who hired to you go on that trip?

19   A.    Doña Alma Preciado.

20   Q.    And during the time that you were on that trip,

21   did you have the sat phone with you?

22   A.    Yes, sir.

23   Q.    And were you communicating with anyone with the

24   sat phone while you were on that trip?

25   A.    At that moment I remember I was eating on the

1    vessel, and I gave the sat phone to Mr. Cameras De Leon
2    so that he would make a call to Doña Alma.
3    Q.    Why were you calling Alma Hernandez?
4    A.    To communicate to her that we were waiting, but
5    that there was nothing.
6    Q.    Well, so did Mr. Jorge Cameras talk with Alma?
7    A.    Yes.
8    Q.    Did he tell her what was happening?
9    A.    Yes.  And she replied for us to return because
10   the other vessel had discarded the drugs.
11   Q.    So who told who that the other vessel scuttled
12   the drugs?  Did Alma tell Jorge or did Jorge tell Alma?
13   A.    Doña Alma notified Mr. Cameras De Leon that she
14   had been notified from South America that the drugs --
15   that there was nothing.  For us to return.
16   Q.    Did you return?
17   A.    Yes, sir.
18   Q.    And when you returned, did you talk to Alma?
19   A.    Yes, sir.
20   Q.    You lived with her; right?
21   A.    Yes, sir.
22   Q.    Did she tell you that she was concerned because
23   she couldn't find you?
24   A.    Yes, sir.
25   Q.    Tell us about that.  What was the problem there?

1   A.      This would be on the trip that we were detained.

2   Q.      No, no.  The one where the load was dumped and

3   you came back, five months before your last trip.

4   A.      Yes.

5   Q.      Did she tell you that she was looking for you,

6   but couldn't find you on the water on that trip?

7   A.      No.

8   Q.      Did you -- was there any delay in you returning

9   on that trip?

10  A.      We went back to land, and after that each one

11  went home because there was nothing.

12  Q.      So on the trip where you were arrested, who hired

13  you?

14  A.      Doña Alma.

15  Q.      And what happened that night when you got

16  arrested on the water?

17  A.      We arrived to the place in the waters that they

18  provided to the captain in this case, Jorge Cameras De

19  Leon.  We had to make contact with another vessel that

20  was coming from South America.

21  Q.      Who did?  Who made that contact?

22  A.      The vessel that I was traveling and my crew

23  mates.

24  Q.      No.

25          Who made the contact?

1   A.      The contact was made by Doña Alma Preciado.

2   Q.      So did you have a sat phone on that trip, the

3   trip you got arrested on?

4   A.      Yes, sir.

5   Q.      And a GPS?

6   A.      Yes, sir.

7   Q.      What happened to those devices?

8   A.      They were thrown in the water.

9   Q.      By who?

10  A.      Mr. Cameras De Leon threw it.

11  Q.      Not you?

12  A.      No.

13  Q.      Why were those devices thrown into the water?

14  A.      Those were the moments we already received the

15  drugs, and the helicopters that were on the vessels

16  started to fly above us.

17  Q.      So what got thrown in the water first, the drugs

18  or the sat phone and the GPS?

19  A.      I remember it was the drugs.  Afterwards the sat

20  phone and then the GPS.

21  Q.      And why do you want to throw away the sat phone

22  and GPS?  They're not illegal.

23  A.      At that moment we didn't think about that.  We

24  just wanted to get rid of the evidence.

25  Q.      Evidence?

1    A.    Yes, sir.

2    Q.    The drugs were evidence?

3    A.    Yes, the drugs are evidence.  The coordinates

4    that are on the GPS are also evidence, and the sat phone

5    could also be used as evidence of receiving drugs.

6    Q.    The drugs implicate you directly; right?

7    A.    Yes, sir.

8    Q.    That's why they go first?

9    A.    Exactly, yes, sir.

10   Q.    The sat phone implicates people on land --

11             MR. MARTINEZ:  Objection as to the leading

12   nature of the question.

13             THE COURT:  Sustained.

14   BY MR. RUDDY:

15   Q.    Who does the sat phone implicate other than

16   people on the boat?

17   A.    The men that were coming from South America.  One

18   of them Diego Perdomo Rivera, Carlos Mijangos Cedeño.

19   After that it would be myself, Miguel Lara, Jorge Cameras

20   De Leon, Antonio Mijangos and Alma Hernandez-Preciado,

21   who sent us.

22   Q.    And how would the phone implicate anyone other

23   than -- besides you on the vessel?  Who else would that

24   sat phone implicate?

25   A.    Some of the crew.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.    Did you talk to Alma on the sat phone?

2   A.    No.  It was with Mr. Diego Perdomo Rivera.  He

3   made a call from the sat phone, I don't know to who, at

4   that moment that we were being arrested to notify that

5   the drugs were going to be thrown in the water and then

6   the Coast Guard helicopters were flying over us.

7   Q.    Okay.  When you received the drugs, how many

8   people were on your panga?  The names of the three people

9   on your boat.

10  A.    Miguel Lara, Antonio Mijangos and Jorge Cameras

11  De Leon.

12  Q.    When you got to the offload/onload site, did you

13  have a cell phone on your boat -- a sat phone on your

14  boat?

15  A.    Yes, sir.

16  Q.    Who had it?

17  A.    I had it.

18  Q.    And did you use it at any time while you were on

19  this trip?

20  A.    No.

21  Q.    Why were you carrying it?

22  A.    Because it would be used to make a call at any

23  moment.

24  Q.    To who?

25  A.    To the other vessel that was coming because they

1  also have another sat phone.

2  Q.    Did you ever do that at any of the other trips

3  you recounted this morning?

4  A.    Would you please repeat the question.  I didn't

5  understand it.

6  Q.    Did you ever use the sat phone to call the other

7  vessels during any of your trips?

8  A.    This last time that -- no.

9  Q.    All right.  Did you ever use the sat phone to

10  call Alma Hernandez-Preciado during any of your trips?

11  A.    I didn't make any calls because it was not

12  necessary and I did not call.

13  Q.    So you never called the offload boat, you never

14  called Alma.  Why did you throw the phone in the water?

15  A.    The phone was thrown into the water because Diego

16  Perdomo Rivera had made a call.  I suppose that it was to

17  South America to notify the drugs were thrown in the

18  water and I believe that's why he called.  That's why we

19  had the satellite phone.

20  Q.    Did you start throwing the bales in the water

21  before or after the phone call was made?

22  A.    It was after the call was made.

23  Q.    Now, in addition to these trips that you talked

24  about, did you ever go to Colombia?

25  A.    Yes, sir.

1   Q.      When?

2   A.      I don't remember the month and the year exactly,

3   but I believe it was at the beginning of 2008 or 2009.

4   Q.      All right.  Was it before or after you started

5   running loads for Alma off the coast of Guatemala?

6   A.      It was before.

7   Q.      And when you went to Colombia, did you go alone?

8   A.      No.

9   Q.      With who?

10  A.      Doña Alma.

11  Q.      Whose idea was it to go to Colombia?

12  A.      A man, he was her contact, said would she travel

13  to Colombia.  That he wanted to meet her.

14  Q.      Who's her?  Who is she, the name?

15  A.      I'm referring to Doña Alma.

16  Q.      So it was her contact.  Did she explain to you

17  how she got this contact in Colombia?

18  A.      Yes, sir.

19  Q.      What did she tell you?

20  A.      That by way of Mr. Rivera she had received a drug

21  load.

22  Q.      Who received a drug load?

23  A.      Doña Alma.

24  Q.      Where?

25  A.      In that occasion when she received that drugs, I

1    wasn't present.

2    Q.    So what have you learned about it from Alma?

3    A.    Because she made me that comment.

4    Q.    What did she tell you?  How did she receive the

5    drugs?

6    A.    She told me that she received the drugs, but she

7    didn't give me any major comments.

8    Q.    Did she receive the drugs in Guatemala?  Was she

9    specific in that regard?

10   A.    Excuse me?

11   Q.    Where did Alma receive the drugs?

12   A.    She didn't comment about the place, but she did

13   comment that she had received 50 kilos of cocaine.  There

14   was another person that had 3 more kilos of cocaine in

15   the capital city of Guatemala that were to be delivered

16   to myself for a total of 53 kilos of cocaine.

17   Q.    And did you receive the extra three kilos?

18   A.    Yes, sir.

19   Q.    What did you do with them?

20   A.    I took them to the City of Tecun Uman in

21   Guatemala, and they were delivered to Doña Alma.

22   Q.    By who?

23   A.    The three kilos were delivered by a Colombian --

24   a man who said to be Colombian.

25   Q.    What was the purpose of the trip to Colombia with

1    Alma Hernandez?

2    A.    It was to get to know the person from whom she

3    had received the load we're talking about.

4    Q.    So you had already received the drugs?

5    A.    Yes, sir.

6    Q.    And what were you supposed to do with the drugs?

7    A.    She would sell them after she received them.

8    Q.    How do you know this?

9    A.    I was living with her at her home.

10   Q.    Where did these sales take place?

11   A.    In the City of Tecun Uman.

12   Q.    Were you present for any of them?

13   A.    For the negotiations, no.

14   Q.    For the deliveries?

15   A.    For the delivery of the three kilograms, yes,

16   because it was I who delivered them.  But for the rest I

17   did not come to find out.

18   Q.    And in addition to that load, you're also aware

19   of another load of cocaine, right?

20   A.    Yes, sir.

21   Q.    And tell us about that.

22   A.    I went to receive another shipment within ocean

23   waters, Pacific Ocean.  I believe it was around 190 kilos

24   of cocaine.

25   Q.    From who?

1   A.      They were sent from South American to Doña Alma

2   Preciado.

3   Q.      By whom?

4   A.      I don't have names, but -- just a man.  I heard

5   comments from her.  They were from a group called -- they

6   make themselves be called with two nicknames.

7           One is Los Salserines de Ecuador, and the other

8   one is Los Choneros de Ecuador.  But they are the same.

9   Q.      And these were the suppliers of this amount of

10  drugs?

11  A.      Yes, sir.

12  Q.      How many different groups of drug traffickers was

13  Alma dealing with?

14  A.      It's four.

15  Q.      All right.  Was that Valela, was that one?

16  A.      Yes, sir.

17  Q.      And what's the second one?

18  A.      The second one would be the one of Carlos Rafael

19  Murillo Alcibar and Ernesto Danilo Murillo Alcibar.

20  Those are two brothers.

21  Q.      All right.  Third?

22  A.      That would be the one where Mr. William Valela,

23  Mr. Nixon and Naser, two cousins, and Mr. Diego Fernando

24  Perdomo Rivera, who's also a cousin of those two, and Mr.

25  Carlos Meros Cedeño.

```
1    Q.      And the fourth group?

2    A.      Mr. Ricardo Fernando -- the fourth group would be

3    Mr. Ricardo Fernandez -- Fernando Fernandez, who --

4    Q.      All right.  So let's go through these.  First

5    group, how many loads did you pick up on the water for

6    them?

7    A.      Well, I couldn't identify the groups by numbers

8    because we've spoken about all of them.  And --

9    Q.      Well, you certainly knew that the load guard

10   Perdomo and Mr. Meros were related to the Naser group;

11   right?

12   A.      Yes, sir.

13   Q.      All right.  So based on the load guards, you know

14   what group you're dealing with?

15             MR. MARTINEZ:  Objection, leading.

16             THE COURT:  Sustained.  Rephrase.

17   BY MR. RUDDY:

18   Q.      How many times did you deal with the group -- the

19   first group?

20   A.      It would have been on two occasions.

21   Q.      How much?

22   A.      One trip that was sent before the one in which I

23   was detained.

24   Q.      So what, one successful trip or two successful

25   trips?
```

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

A.    There was one successful, and then the one in
which I was detained.

Q.    That was from the first group?

A.    Yes.

Q.    The first group is -- what is their name?

A.    Well, the first group would be where Mr. William
Valela is involved.

Q.    I thought that he was the third group.

A.    I don't know if you would call him in being in
the first or second group because he, Mr. Valela, is the
one who made the contacts for Doña Alma.

Q.    All right.  Let's try this again.  Name the
different groups.  You said there were four of them?

A.    Yes, sir, but I don't know the numerical order.

Q.    You can put them in whatever order you want.

A.    Okay.  That's fine.

Q.    One?

A.    That would be -- let's say number one, the one
that went down, the one we were detained in.  On this one
it would be on the Guatemalan side Doña Alma Preciado,
and Miguel Lara would be involved on the vessel.

Q.    Sir, Mr. Lara, you said there were four groups
that Alma Hernandez was dealing with that you were
receiving drugs from.  Name those groups.

A.    Okay.  One would be the group of Mr. Ernesto

1    Murillo Alcibar, Carlos Rafael Murillo Alcibar and

2    Eduardo Efrain Castaneda.

3    Q.    All right.  Is Restrepo -- are those two in the

4    same group?

5    A.    Who's Restrepo?

6    Q.    I'm sorry.

7         THE COURT:  I'm sorry.  Why don't we take a

8    recess here and you can start again.

9         MR. RUDDY:  All right.

10        THE COURT:  All right.  It's 12:25.  We're

11   going to recess for lunch.  We'll take an hour and

12   15 minutes.  We'll be in recess till 1:40.  Please leave

13   your pads on your chairs.  And we'll start again at 140.

14        COURT SECURITY OFFICER:  All rise, please,

15   for the jury.

16     (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

17        THE COURT:  Sir, you may step down.  We'll

18   start again at 1:40.

19        Let's go back to the tapes.

20        MR. RUDDY:  I thought the tough sledding was

21   over.

22        THE COURT:  I'm going to ask if you all

23   would put your monitors down.  I can't see her.  I mean,

24   I don't think that's why he's not identifying her, but I

25   can't see her and I can't see you either, the

```
 1    interpreter.  So --
 2     (THEREUPON, THE LUNCHEON RECESS WAS TAKEN, AND THEN THE
 3              PROCEEDINGS CONTINUED AS FOLLOWS:)
 4              THE COURT:  Would you bring in the jury,
 5    please.
 6              COURT SECURITY OFFICER:  Yes, Your Honor.
 7              All rise, please, for the jury.
 8      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)
 9              COURT SECURITY OFFICER:  Thank you, ladies
10    and gentlemen.  Please be seated.
11              THE COURT:  Mr. Ruddy.
12              MR. RUDDY:  Thank you, Your Honor.
13    BY MR. RUDDY:
14    Q.    Mr. Lara, when we broke for lunch we were trying
15    to get you to clarify the four groups that Alma
16    Hernandez-Preciado worked with.  Los Choneros and Los
17    Salserines, who are they?
18    A.    I don't know them, but they do send merchandise
19    to Guatemala.
20    Q.    How do you know this?
21    A.    Because Doña Alma, I heard her talking over a
22    telephone call.
23    Q.    When was this?
24    A.    Days before having received the drug shipment and
25    days after having received it.
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      Was this one time or many times?

2   A.      It was one only time.

3   Q.      What about Ricardo Fernando Fernandez Cruz?

4   A.      Yes.  It was him before coming to Colombia.  And

5   we travelled to Colombia.

6   Q.      Was he a supplier?

7   A.      Yes, the only one.  I don't know anyone else but

8   him.

9   Q.      How about Carlos Rafael Murillo?

10  A.      Well, yes, him and his brother.  Donilo Ernesto

11  Murillo Alcibar, they are another group.

12  Q.      All right.  And did they supply Alma?

13  A.      Yes, sir.

14  Q.      How many times?

15  A.      I believe it was on three occasions.

16  Q.      How about Xavier Molina?

17  A.      It was two opportunities.

18  Q.      Two times?

19  A.      Yes, sir.

20  Q.      And Xavier Molina, did he go by any other names?

21  A.      Larry Molina.

22  Q.      Jorge Alvarado Hidalgo, who is that?

23  A.      He's the father of Doña Alma Preciado's son.

24  Q.      Was he her husband?

25  A.      It's my understanding that he is.

Q.      Okay.  How about Marcia Isabel Preciado Gonzalez,
who's she?

A.      She's an aunt of Doña Alma Preciado.

Q.      And does she have a nickname?

A.      That I know of, no.

Q.      We talked about Jorge Grijalva; right?

A.      Yes, sir.

Q.      He's the fellow in jail?

A.      Excuse me?

Q.      Jorge Grijalva, he worked with Alma?

A.      He made the contacts in Ecuador, yes.  But as far
as working with drugs, he did receive some quantities of
drugs in the jail, but small amounts.

Q.      How about Gabriel Montepeque, also known as
Pollito, who's he?

A.      He would arrive to Doña Alma's house while I was
also there in the house where I lived with her.  He
says --

        MR. MARTINEZ:  Objection as to what he says.

        THE COURT:  I'm sorry?  Did you say
something?

        MR. MARTINEZ:  I'm sorry, Your Honor.  I
objected as to what the witness was saying the other
gentleman said.

        THE COURT:  Objection sustained.

BY MR. RUDDY:

Q.     What is your understanding of the association or relationship between Pollito and Alma?

A.     He arrived at the house and spoke with her.  I don't know what about because I didn't know.

Q.     You had no idea?

A.     No.

Q.     Carlos Enrique Sapon Castillo, who's he?

A.     From what I have heard of him, he was detained --

       MR. MARTINEZ:  Objection.

       THE COURT:  Ask the question again, please.

       MR. RUDDY:  All right.

BY MR. RUDDY:

Q.     Do you know this person, yes or no?

A.     Yes, I do.

Q.     Okay.  Did you tell the agents about him when they interviewed you?

A.     Yes, sir.

Q.     Okay.  Did he have any involvement in the load for which you got arrested?

A.     Yes, because he's the buyer of cocaine.

Q.     And how did you learn this?

A.     Because Doña Alma had told me she had done some business with him.

Q.     What kind of business?

```
 1   A.      Cocaine.
 2   Q.      Does Alma Hernandez do anything in the way of
 3   business anything other than drug business?
 4   A.      No.  That I know of, no.
 5   Q.      Manuel Gonzalez Gutierrez, we talked about him;
 6   right.  Who's he?
 7              THE INTERPRETER:  Was the name Manuel?
 8              MR. RUDDY:  Gonzalez Gutierrez.
 9              THE WITNESS:  He's one of the guys that came
10   in one of the first vessels.
11   BY MR. RUDDY:
12   Q.      And he is what nationality?
13   A.      My understanding is that he's Mexican, but he
14   lives in Ecuador.
15   Q.      And what group is he tied to?
16   A.      The group of Larry Molina and Diego Perdomo
17   Rivera.
18   Q.      And William Valela, he's in a separate group?
19   A.      He's the one that made the contacts for Doña
20   Alma.  I don't know if he could be placed in one group.
21   Q.      Well, how many trips was William Valela involved
22   with with Alma?
23   A.      I believe that in all of them.
24   Q.      Emerson Raul Gonzalez, who is he?
25   A.      He arrived at the house because he was a
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    trustworthy person to Doña Alma.  She called him a

2    partner and a person of trust.

3    Q.    Did you tell the agents about Emerson?

4    A.    Yes, sir.

5    Q.    What did you tell the agents was the drug

6    relationship between Emerson and Alma?

7    A.    That he arrived at the house, a person of trust

8    of her.  That on certain occasions he purchased certain

9    amounts, small, from Doña Alma.

10   Q.    Small what?

11   A.    Little grams or one or two ounces.

12   Q.    Who is Horacio Contreras?

13   A.    A person who has some -- a friendship with Doña

14   Alma.

15   Q.    Does he have any drug association with Alma

16   Hernandez?

17   A.    That I know of, no.

18   Q.    Did you talk to the agents about Mr. Horacio

19   Contreras, also known as known as Lachito?

20   A.    Yes, sir.

21   Q.    And what did you tell the agents what was

22   Lachito's drug association with Alma?

23   A.    That on certain occasions he would receive the

24   money from the Mexican contacts and then he would help

25   take it to Guatemala.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      Across the border?

2   A.      Yes, sir.

3   Q.      What about drugs from Guatemala to Mexico, would

4   he help with those as well?

5   A.      Yes, sir.

6   Q.      And you remember telling the agents that; right?

7   A.      Yes, sir.

8   Q.      How about Eric Zuniga, who's he?

9   A.      I don't know him personally.  But I've heard

10  being there that he is the mayor of the City of Tecun

11  Uman.

12  Q.      And does he have any drug relationship with Alma

13  Hernandez?

14  A.      Well, the product that was to go out, it's my

15  understanding that he would get half.

16  Q.      Who would get the other half?

17  A.      Mr. Carlos Enrique Sapon Castillo.

18  Q.      Moises Preciado-Gonzalez, who's he?

19  A.      He's an uncle of Doña Alma Preciado.

20  Q.      And does he have any drug association with Alma

21  Hernandez and the mayor of Tecun Uman?

22  A.      That I know of, no.

23  Q.      Do you remember talking to the agents about him?

24  A.      I don't remember.

25  Q.      You said you were living with Alma Hernandez for

1   seven years?

2   A.      Yes, sir.

3   Q.      Did you ever try to break off the relationship?

4   A.      Yes, sir.

5   Q.      What happened when you told Alma Hernandez you

6   wanted to break off the relationship?

7   A.      She told me no, that I had to live with her.

8   Q.      Well, was it simply no or was there some threat

9   involved with the no?

10  A.      Well, on certain occasions yes.  She said that I

11  was with her -- I should be with her because on the

12  contrary I would have signed my sentence.

13  Q.      Are -- are you married not to Alma, but to a

14  woman?

15  A.      Yes, sir.

16  Q.      And do you have any children by your wife, not

17  Alma?

18  A.      Yes, sir.

19  Q.      When Alma told you you could not break up with

20  her, did she mention anything about your wife and your

21  children?

22  A.      Yes, sir.

23  Q.      What about your wife and your children?

24  A.      She said that she's going to kill -- to kill if I

25  continued with the mother of my children.

set

Q.     But what was going to happen to your wife and your child if you left Alma, were they going to live or were they going to die?

A.     That they were going to die.

Q.     And when was this in relation to the time that you started becoming involved in this drug smuggling operation for Alma Hernandez?

A.     It was from 2007 on.

Q.     So what, the threats started in 2007 and continued?

A.     Yes, sir.

Q.     So it's happened on more than one occasion?

A.     Yes, sir.

Q.     Did you believe the threats?

A.     Yes, but I thought that as something normal.

Q.     For who, for Alma or for everybody else?

A.     Everyone else, who are you referring to?

Q.     Other people.

A.     It would be the mother of my children.

Q.     You have a wife; right?

A.     Yes, sir.

Q.     When you left her, did she say she was going to kill you or your children, yes or no?

         MR. MARTINEZ:  Objection as to what the other wife told him.  It's hearsay.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  Was the question about the other

2    wife, what the other wife said?  Sustained.

3    BY MR. RUDDY:

4    Q.     Now, how long were you on the Navy frigate after

5    you got arrested, how many days?

6    A.     Around 18, 20 days.  I don't remember exactly the

7    amount of days.

8    Q.     18, 20 days?

9    A.     Inexactly because I don't remember the amount of

10   days, but it was between 18 and 20 days.

11   Q.     Now, what date were you arrested on the water?

12   A.     May 18th, 2011.

13   Q.     And what day did you arrive in Tampa, Florida?

14   A.     I don't remember.

15   Q.     When you arrived in Tampa, Florida, did you talk

16   to agents?

17   A.     Yes, sir.

18   Q.     Did they give you your rights -- read you your

19   rights?

20   A.     Yes, sir.

21   Q.     Did they also hand you a rights form paper?

22   A.     Yes, sir.

23   Q.     Did you sign it?

24   A.     Yes, sir.

25   Q.     And did you agree to talk to them?

```
1   A.      Yes, sir.
2               MR. RUDDY:  If I could approach, Your Honor?
3               THE COURT:  You may.
4   BY MR. RUDDY:
5   Q.      For identification only is Government's
6   Exhibit 16.  Would you look at that.  In the right-hand
7   corner there's the date.  Note it to yourself.  Do you
8   see it?
9   A.      Yes, sir.
10  Q.      Okay.  Does that refresh your recollection of
11  when you arrived in Tampa, Florida?
12  A.      Yes, sir.
13  Q.      All right.  What day did you arrive in Tampa,
14  Florida?
15  A.      June 1st.
16  Q.      June 1st.
17  A.      Of 2011.
18  Q.      And you -- you talked with the agents; right?
19  A.      Yes, sir.
20  Q.      And they asked if you wanted to make a phone
21  call; right?
22  A.      Yes, sir.
23  Q.      And did you tell them who you wanted to call?
24  A.      Yes, sir.
25  Q.      Who did you tell them you wanted to call?
```

1    A.    A neighbor whose name was Doña Juanita.

2    Q.    And did you give a phone number?

3    A.    Yes, sir.

4    Q.    What was that number?

5    A.    At this moment I don't remember it.

6          MR. RUDDY:  If I could approach the witness,

7    Your Honor?

8          THE COURT:  You may.

9    BY MR. RUDDY:

10   Q.    For identification, Exhibit 17.  It's a report in

11   English of your interview on June 1st.

12   A.    Yes, sir.

13   Q.    Do you see a phone number in that report?

14   A.    I do see -- yeah, it that is one.

15   Q.    Is that the phone number that you gave the agents

16   on June 1st to call?

17   A.    Yes, sir.

18   Q.    And who did you tell them -- did you give them a

19   name of the person you were calling at that number on

20   June 1st?

21   A.    Yes.  I said I wanted to call a neighbor whose

22   name was Doña Juanita.

23   Q.    And when you called that number, did someone

24   answer?

25   A.    Yes, sir.

```
1    Q.    And this call was on speakerphone; right?

2    A.    Yes, sir.

3    Q.    And when you called, what did the person say?

4          MR. MARTINEZ:  Objection as to what Juanita

5    said.

6          THE COURT:  Sustained.

7    BY MR. RUDDY:

8    Q.    The number that you called that you gave the

9    agents on June 1st, was that the number for Alma

10   Hernandez?

11   A.    Yes.

12   Q.    Not your neighbor?

13   A.    Yes, sir.

14   Q.    Did you -- once you're incarcerated at the

15   Pinellas County Jail -- well, before we move on, did you

16   actually talk to Alma that night?

17   A.    Yes, sir.

18   Q.    For how long?

19   A.    For a time of the most, one minute.

20   Q.    Who terminated the call, you or Alma?

21   A.    I terminated it.

22   Q.    And why was that?

23   A.    Because I only wanted to notify her that I was in

24   Tampa, Florida, and that I was detained.  And also to

25   notify my mother that I was detained and I was in Tampa,
```

1    Florida.  That's all we spoke about.

2    Q.    In your phone conversation did you tell Alma that

3    you -- that your end was on speakerphone?

4    A.    No, I did not.

5    Q.    Did you tell Alma that the police were there

6    listening to your conversation you were having with her?

7    A.    I didn't say that to her either.

8    Q.    Why did you want to terminate this call so

9    quickly other than to tell her where you were and that

10   you were all right?

11   A.    Because the agents were with me, and I did not

12   want them to hear who I was speaking with.

13   Q.    You gave a statement that night, June 1st, to the

14   agents about your involvement in this drug venture;

15   right?

16   A.    Yes, sir.

17   Q.    Never mentioned Alma, the woman whose home you

18   called prior to the interview; right?

19   A.    No, sir.

20   Q.    No, you never mentioned her?

21   A.    No.

22   Q.    Once you were incarcerated in the Pinellas County

23   Jail, did you have any other phone contact with Alma

24   Hernandez?

25                THE INTERPRETER:  I'm sorry?  Would you

1    repeat.

2    BY MR. RUDDY:

3    Q.    After June 1st did you have any phone contact

4    with Alma Hernandez?

5    A.    Yes.

6    Q.    And how was that arranged?

7    A.    It's after I had pled guilty and I was -- I found

8    myself there in the City of Citrus.

9    Q.    Citrus, Florida?

10   A.    Yes.

11   Q.    And you were at the Citrus County Jail?

12   A.    Yes, sir.

13   Q.    And how did you contact Alma from the Citrus

14   County Jail?

15   A.    I was detained in a cell at the jail of Citrus

16   County.  My cellmate gave me a phone number of an

17   attorney.  That's when I called her.

18   Q.    Called who?

19   A.    Doña Alma to speak with her about an attorney,

20   female.

21   Q.    And what was the name of this attorney?

22   A.    Darlene Barror.

23   Q.    Barror?

24   A.    Barror.

25   Q.    B-A-R-R-O-R?

```
 1    A.      Yes, sir.
 2    Q.      And so did you call Alma Hernandez from the
 3    Citrus County Jail about hiring this attorney, Darlene
 4    Barror?
 5    A.      Yes, sir.
 6    Q.      And was that call recorded?
 7    A.      Yes, sir.
 8    Q.      Are you aware, are all the calls in most jails
 9    recorded?
10    A.      Yes, sir.
11    Q.      And that's for a specific account for each
12    inmate?
13    A.      Yes, sir.
14    Q.      And when you called Alma from the Citrus County
15    Jail, did you call on another inmate's -- under another
16    inmate's name?
17    A.      Yes, sir.
18    Q.      And during the discussion you had with Alma on
19    that day, what was decided regarding hiring this
20    attorney, Darlene Barror?
21    A.      That, yes, she would be hired.
22    Q.      Who was going to pay for it?
23    A.      Doña Alma.
24    Q.      Did she?
25    A.      Yes, sir.
```

1    Q.     How do you know that?

2    A.     Because in the call when I spoke with Doña Alma I

3    gave her the phone number to the attorney, and I told her

4    that I had been given the phone number of an attorney who

5    spoke Spanish and she was good -- a very good attorney.

6    Q.     So did Darlene Barror become your lawyer --

7    A.     Yes, sir.

8    Q.     -- in your case?

9    A.     Yes, sir.

10    Q.     Who was the Judge in your case?

11    A.     His Honor Richard Lazzara.

12    Q.     In this courthouse; right?

13    A.     Yes, sir.

14    Q.     After Darlene Barror filed an appearance as your

15    lawyer prior to your sentencing, did you and other

16    members of her attorney's office approach your

17    co-defendant, Mr. Mijangos?

18             THE INTERPRETER:  Mr.?

19             MR. RUDDY:  Mijangos.

20             THE WITNESS:  Yes, sir.

21    BY MR. RUDDY:

22    Q.     Did you and other attorneys working in Darlene

23    Barror's office meet with Mr. Mijangos in the Citrus

24    County Jail?

25    A.     Yes, sir.

1    Q.    Did you and the lawyers from Miss Barror's office

2    try to convince Mr. Mijangos to hire them to represent

3    him?

4    A.    Yes, sir.

5    Q.    And the idea was that he would take the blame --

6          MR. MARTINEZ:  Objection, leading.

7          THE COURT:  Sustained.

8          MR. RUDDY:  All right.

9    BY MR. RUDDY:

10   Q.    What did you tell Mr. Mijangos would be his

11   benefit to hiring other lawyers from your lawyer's

12   office?

13   A.    One of the -- counselor would also be

14   representing him as well.

15   Q.    You had already pled guilty; right?

16   A.    Yes, sir.

17   Q.    Had you received your presentence report?

18   A.    Yes, sir.

19   Q.    And in the presentence report was your role in

20   the offense discussed?

21   A.    Yes, sir.

22   Q.    And your role, was it enhanced?

23          MR. MARTINEZ:  Objection as to what the

24   presentence report said if that's where we're going.

25          THE COURT:  Well, I'd sustain it as far as

1    the presentence report.  But you can ask him if he knows.

2    BY MR. RUDDY:

3    Q.    Did you review your presentence report?

4    A.    Yes.  But what I understood is very little

5    because it was in English, and I understand very little

6    English.

7    Q.    Well, you had a lawyer prior to Darlene Barror;

8    right?

9    A.    Yes.

10   Q.    And he was an English speaking attorney; right?

11   A.    Yes, sir.

12   Q.    So he couldn't communicate with you because you

13   don't speak any English; right?

14           MR. MARTINEZ:  Objection to the leading

15   questions.

16           THE COURT:  Sustained.

17   BY MR. RUDDY:

18   Q.    How did you communicate with your lawyer?

19   A.    I have her phone number.  And I call her at her

20   office, and a secretary at her office answers.

21   Q.    We're not talking about Darlene Barror.  We're

22   talking about Mr. -- who was the name of your first

23   attorney?

24   A.    My first attorney was one given by the state and

25   his name I heard was McCluskey -- Attorney McCluskey.

1    Q.    Did you ever meet with him?

2    A.    Yes.

3    Q.    Did he speak English only?

4    A.    Only English.

5    Q.    How did you communicate with him?

6    A.    By way of an interpreter that he would bring.

7    Q.    And after the attorney received the presentence

8    report, did you meet with that attorney, Mr. McCluskey,

9    with an interpreter?

10   A.    No, not any more.

11   Q.    At any time after did you meet with Mr. McCluskey

12   to discuss your presentence report with an interpreter?

13             MR. MARTINEZ:  Objection, asked and

14   answered.

15             THE COURT:  Overruled.

16             THE WITNESS:  Yes, sir.

17   BY MR. RUDDY:

18   Q.    And what did you learn from the interpreter --

19   that the interpreter told you about how your role was

20   assessed for this offense?

21             MR. MARTINEZ:  Objection as to what the

22   interpreter said was in the presentence report.

23             THE COURT:  Okay.  Sustained.  Rephrase the

24   question.

25             MR. RUDDY:  Certainly.

BY MR. RUDDY:

Q.     What was your understanding after meeting with
your attorney and the interpreter what your role was?

A.     Yes, of the presentence that was going to be
taken.

Q.     Your role, was it -- was it your understanding
you were going to be enhanced or --

            MR. MARTINEZ:  Objection, leading.

            THE COURT:  No.  Overruled.

            You may answer the question.

            Repeat the question.

BY MR. RUDDY:

Q.     After meeting with your attorney and the
interpreter, what was your understanding about your role,
whether it would be enhanced, mitigated or not adjusted?

A.     That I was going to be sentenced to 25 years of
jail up to life.

Q.     And that concerned you; correct?

A.     Yes, sir.

Q.     Is that why you called Alma on the other
prisoner's account --

A.     Yes, sir.

Q.     -- recommending Darlene Barror be hired?

A.     Yes, sir.

Q.     So what was the meeting you had with Darlene

1    Barror's other lawyers and Jose Mijangos about?

2    A.    It was to start the contract of Attorney Darlene

3    Barror for myself and for Mr. Mijangos.

4    Q.    And at this meeting you had with Mr. Mijangos,

5    what was suggested he do?

6              MR. MARTINEZ:  Could we have an

7    identification as to whom suggested that?

8              THE COURT:  Sustained.  Sustained.

9    BY MR. RUDDY:

10   Q.    Did you suggest to Mr. Mijangos what he should do

11   regarding your role?

12   A.    Yes.

13   Q.    All right.  What did you tell him?

14   A.    Well, I told him that I was going to accept my

15   responsibility for what I did, and that he too should

16   accept his responsibility if he wanted.

17   Q.    Was Mr. Mijangos complaining about his lawyers or

18   his presentence report to you?

19             MR. MARTINEZ:  Objection as to what that

20   gentleman told this witness.

21             THE COURT:  Sustained.

22   BY MR. RUDDY:

23   Q.    Whose idea was it to have Darlene Barror's

24   associates in her law office approach Mr. Mijangos to

25   represent him?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1              MR. MARTINEZ:  Objection, the question
2    assumes facts.
3              THE COURT:  Sustained.
4    BY MR. RUDDY:
5    Q.    Mr. Lara --
6              MR. MARTINEZ:  Your Honor, the objection was
7    sustained.
8              MR. RUDDY:  I'm asking another question.
9              MR. MARTINEZ:  Oh, okay.  I thought he was
10   asking for a response.
11   BY MR. RUDDY:
12   Q.    Mr. Lara, have you seen Mr. Mijangos recently?
13   A.    Yes, sir.
14   Q.    Are you aware whether or not he's going to
15   testify in this case?
16             MR. MARTINEZ:  Objection without
17   establishing a predicate for that knowledge based on what
18   someone else told him.
19             THE COURT:  Overruled.
20             You may answer the question.
21             THE WITNESS:  I'm not aware.
22   BY MR. RUDDY:
23   Q.    After your meeting with Mr. Mijangos and Darlene
24   Barror's associates in jail, did you attend a hearing in
25   front of Judge Lazzara?
```

```
1    A.      Yes, sir.

2    Q.      And what happened to Darlene Barror after that

3    hearing?

4    A.      Attorney Darlene told me that --

5            MR. MARTINEZ:  Objection as to what she

6    said.

7            THE COURT:  Sustained.

8    BY MR. RUDDY:

9    Q.      After the hearing in front of Judge Lazzara, was

10   Darlene Barror any longer your lawyer?

11   A.      Not any more.

12   Q.      No?

13   A.      No.

14   Q.      Now, did you have a conversation with Alma

15   Hernandez-Preciado on August 17, 2011?

16   A.      Yes, sir.

17   Q.      And was that from a jail?

18   A.      Yes, sir.

19   Q.      What jail?

20   A.      Citrus.

21   Q.      And on this phone call did you -- did you call

22   under your real name?

23   A.      I don't remember.

24   Q.      Well, you did call; right?

25   A.      Yes, sir.
```

```
1    Q.    You did have a conversation with Alma Hernandez;
2    right?
3    A.    Yes, sir.
4    Q.    You reviewed that recording; right?
5    A.    Yes, sir.
6              MR. RUDDY:  If I could approach, Your Honor?
7              THE COURT:  You may.
8    BY MR. RUDDY:
9    Q.    I'll show you what's marked for identification,
10   Mr. Lara, as Government Exhibit 14A.  That's a CD; right?
11   A.    Yes, sir.
12   Q.    Are your initials on that?
13   A.    Yes, sir.
14   Q.    And what is that a CD of?
15   A.    The recording of a call that I made to Doña Alma.
16   Q.    Right.
17         And did you speak on this recording with Alma
18   Hernandez?
19   A.    Yes, sir.
20   Q.    Did you write anything on this CD other than your
21   initials?
22   A.    Yes.
23   Q.    What?
24   A.    Her name -- the initials to my name and her name.
25   Q.    A for what?
```

1    A.    The first initials to her name.

2    Q.    What's her name?

3    A.    Doña Alma Lucrecia.

4    Q.    And is there a last -- is there a last name on

5    it?

6    A.    Yes, sir.

7    Q.    What's the last name?

8    A.    Preciado.

9    Q.    You wrote that?

10   A.    Yes, sir.

11   Q.    This is Alma?

12   A.    Yes, sir.

13              MR. RUDDY:  Offer Government's Exhibit 14 A

14   and B moved into evidence.

15              MR. MARTINEZ:  No objection.

16              THE COURT:  It's in evidence, 14A and B.

17              MR. RUDDY:  Permission to publish, Your

18   Honor?

19              THE COURT:  You may publish.

20       (EXHIBITS 14A AND 14B ADMITTED INTO EVIDENCE.)

21              (AUDIO PLAYING, EXHIBIT 14A.)

22   BY MR. RUDDY:

23   Q.    "Don't you go confessing anything here.  I have

24   already told you not to say anything that you may --

25   that you may regret later"; is that correct?

```
 1   A.      Yes, sir.
 2                   (AUDIO PLAYING, EXHIBIT 14A.)
 3   BY MR. RUDDY:
 4   Q.      "You know that I will always respect you and will
 5   always be looking after you and your family."
 6           Did you hear?  How did you take that?
 7   A.      That she would be with them making sure that
 8   nothing happens to them.  Or perhaps if they needed
 9   something, she would be there.
10                   MR. RUDDY:  Go ahead.
11                   (AUDIO PLAYING, EXHIBIT 14A.)
12   BY MR. RUDDY:
13   Q.      Mr. Lara, who is Don Danny?
14   A.      He's a friend of mine.  He's a co-godfather with
15   my mom and dad.  He's the grandfather of a little girl --
16   he's the godfather of a little girl who my mother has
17   been raising, so she has -- as if she were her
18   granddaughter.
19                   (AUDIO PLAYING, EXHIBIT 14A.)
20                   MR. RUDDY:  Your Honor, could we switch to
21   the document camera.  All right.
22   BY MR. RUDDY:
23   Q.      Mr. Lara, you said that this woman here --
24                   THE COURT:  I'm sorry.  Could I get you to
25   pull the monitors down.  And --
```

BY MR. RUDDY:

Q.     This woman right here is who?

A.     Doña Alma.

Q.     Her full name?

A.     Doña Alma Lucrecia Hernandez-Preciado.

Q.     That's 13A.  I'll show you what's marked as Government's Exhibit 13A-1.  Take this pen and write the name of this woman as you know her.  Put your initials there.

A.     Here or here?

Q.     On the photograph.

A.     (Witness complies.)

Q.     Are you finished?

A.     Yes.

Q.     Would you put the date -- today's date on it, please.

A.     Right here?

Q.     Anywhere on the paper.

A.     I'm sorry.  What's today's date?

Q.     Today is September 17th, 2013.  Finished?

A.     Yes.

                MR. RUDDY:  I'd offer Government's 13A-1.

                MR. MARTINEZ:  If it's not in evidence, I have no objection to it being entered.

                THE COURT:  I will receive into evidence

1    13A-1.

2              (EXHIBIT 13A-1 ADMITTED INTO EVIDENCE.)

3    BY MR. RUDDY:

4    Q.    Now, Mr. Lara, the woman in the photograph you

5    just identified as Alma Hernandez-Preciado and whose

6    voice you just identified as Alma Hernandez-Preciado, is

7    she here today?

8    A.    Yes, sir.

9    Q.    Where is she?

10   A.    (Pointing)  She's here.

11   Q.    What is she wearing here today?

12   A.    A black jacket and a blue shirt.

13   Q.    Anything on her head?

14   A.    Headphones.

15             MR. RUDDY:  Let the record reflect the

16   witness identified the defendant.

17             THE COURT:  The record will so reflect.

18   BY MR. RUDDY:

19   Q.    Mr. Lara, I asked you before if Miss Hernandez

20   was here.

21   A.    Yes, sir.

22   Q.    What changed between then and now?

23   A.    That she was not found here.

24             MR. RUDDY:  Nothing further.

25             THE COURT:  Do you want to --

1    Mr. Martinez -- are you finished, Mr. Ruddy?

2              MR. RUDDY:  Yes.  No further questions,

3    Judge.

4              THE COURT:  Do you want to take a recess

5    here or do you want to go ahead?

6              MR. MARTINEZ:  We can go forward, whatever

7    the Court's pleasure.

8              THE COURT:  Do you want to take a recess or

9    do you want to keep going for a little bit?  What?

10   Recess?  Okay.

11             Let's take a recess.  We'll be in recess

12   till 3:25.  Please don't discuss the case.  You're

13   welcome to walk around.

14             COURT SECURITY OFFICER:  All rise, please,

15   for the jury.

16             THE COURT:  Mr. Lara, you may step down,

17   sir.

18        (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

19             THE COURT:  We're in recess till 3:25.

20   (THEREUPON, A RECESS WAS TAKEN, AND THEN THE PROCEEDINGS

21                CONTINUED AS FOLLOWS:)

22             COURT SECURITY OFFICER:  All rise.

23             THE COURT:  Would you get the jury.

24             COURT SECURITY OFFICER:  Yes, Your Honor.

25                (PAUSE IN PROCEEDING.)

1          COURT SECURITY OFFICER:  All rise, please,

2   for the jury.

3        (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

4          COURT SECURITY OFFICER:  Thank you, ladies

5   and gentlemen.  Be seated.

6          THE COURT:  Mr. Martinez.

7          MR. MARTINEZ:  Thank you, Your Honor.

8                    <u>CROSS-EXAMINATION</u>

9   BY MR. MARTINEZ:

10  Q.     Mr. Lara, my name is Victor Martinez.  I

11  represent Miss Hernandez.

12  A.     (Nods head.)

13  Q.     Is Miss Hernandez your common law wife?

14  A.     I did live with her until the day I was detained.

15  Q.     For approximately seven years; correct?

16  A.     Yes, sir.

17  Q.     Before you came in here today, even before you

18  took an oath today, you made a promise to come in here

19  and tell the truth, did you not?

20  A.     Yes, sir.

21  Q.     And you made that promise in a plea agreement

22  that you signed with the United States Government?

23  A.     Yes, sir.

24  Q.     And before Mr. Ruddy asked you the first question

25  on direct examination, you were placed under oath by the

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  clerk of this Court, weren't you?

2  A.     Yes, sir.

3  Q.     And then you proceeded to tell lies in here,

4  didn't you?

5  A.     No.  That was the truth.

6  Q.     All right.  Let's examine that.  Let's go through

7  the lies you told today.  The first thing you were asked

8  to do was to identify Miss Hernandez in the courtroom;

9  right?

10  A.     Yes, sir.

11  Q.     And you made a big pretense of looking around the

12  whole courtroom to look for her; is that right?

13  A.     Yes, sir.

14  Q.     Mr. Lara, can you look at me, please, when I'm

15  talking to you.

16         You made a big pretense of looking around the

17  courtroom for her, didn't you?

18  A.     Yes, sir.

19  Q.     And in reality she's sitting right there, isn't

20  she?

21  A.     Yes, sir.

22  Q.     You saw her very well, didn't you?

23  A.     But I did not recognize her.

24  Q.     You didn't recognize your common law wife of

25  seven years sitting in the front row ten feet away from

1   you, that's your testimony?  That's your testimony?

2   That's your present under oath testimony?

3           MR. RUDDY:  I'm going to object to that

4   question.  That's an improper -- repeating the witness'

5   answer.

6           MR. MARTINEZ:  All right.  I'll move on.

7   BY MR. MARTINEZ:

8   Q.     You were then shown a picture of Miss Hernandez

9   by Mr. Ruddy, weren't you; right?

10  A.     Yes, sir.

11  Q.     And that picture, all of us saw that picture on

12  the screen, didn't we?

13  A.     Yes, sir.

14  Q.     And that picture looks just like her, doesn't it?

15  A.     Yes, sir.

16  Q.     And you said that that still didn't refresh your

17  recollection as to finding her in the courtroom, did it?

18  A.     I did not say that.

19  Q.     Well, you were asked a second time by Mr. Ruddy

20  to look again in the courtroom, weren't you?

21  A.     Yes, sir.

22  Q.     And on the second occasion you made another big

23  pretense of looking all around the courtroom and you

24  didn't see her?

25  A.     I did not see her.  It has been two years since I

1  have seen her.  I did not recognize her until a few

2  minutes ago.

3  Q.     Did it occur to you to maybe look right next to

4  the defense lawyer at the table right there?

5  A.     I looked quickly.  My vision is stinging.  I did

6  not see her because I am not seeing well.

7  Q.     So you have bad vision because of stinging, is

8  that your testimony?

9  A.     No.  I'm saying that that's why I did not

10  recognize her on the second occasion that the prosecutor

11  asked me to.

12  Q.     You were ultimately asked on a third occasion

13  right before your direct examination was over to identify

14  her again.  Remember that?

15  A.     Yes.

16  Q.     And that I take it is when your vision suddenly

17  got better?

18  A.     Yes.  I recognized her.

19  Q.     Now, you were also asked several questions on

20  direct examination about conversations that you had with

21  the DEA agents in this case.

22  A.     Yes, sir.

23  Q.     And on those occasions Mr. Ruddy asked you

24  whether or not you knew of a certain matter.  You

25  remember those kinds of questions?

1    A.      Yes, sir.

2    Q.      And you would say under oath, don't know anything

3    about it.  Remember that?  You have to answer out loud.

4    A.      Repeat the question, please.

5    Q.      You would deny having had these conversations or

6    having knowledge about the subject matter that was the

7    question.

8    A.      What's the topic?

9    Q.      Do you remember being asked about conversations

10   that you had with the agents by Mr. Ruddy?

11   A.      Yes.

12   Q.      And he had to ask you those questions because you

13   had previously denied having had those conversations;

14   right?

15   A.      Yes.

16   Q.      And then the very subject matter that he asked

17   you to concede talking to the agents about, you then

18   conceded?

19   A.      Yes, sir.

20   Q.      Which means that your initial response to him was

21   a lie?

22   A.      Not a lie.  What I had said is true.  Did I

23   forget?  That can happen to anyone.

24   Q.      So it's your testimony that you forgot about

25   those conversations until this man reminded you of them?

1  A.    Because he asked me the questions and then I

2  would answer them.

3  Q.    You didn't answer them truthfully the first time,

4  did you?

5  A.    I was thinking about the question maybe.

6  Q.    Do you remember how many times that happened

7  during the course of your direct examination where

8  Mr. Ruddy had to remind you that you had already said it

9  to case agents?

10  A.    I don't remember how many times he repeated the

11  same question.

12  Q.    You were a Guatemalan police officer.  Was that

13  your testimony?

14  A.    Earlier, yes.

15  Q.    And how long were you a Guatemalan police

16  officer?

17  A.    Around one year.

18  Q.    Were you also a drug trafficker while you were a

19  policeman?

20  A.    No, sir.

21  Q.    By your own admission you are a serial drug

22  trafficker, aren't you?

23  A.    No, sir.

24  Q.    Well, we --  you and Mr. Ruddy had conversations

25  about at least four different trips during your direct

1  examination; right?

2  A.    Yes, sir.

3  Q.    Four.  Makes you a serial drug trafficker,

4  doesn't it?

5  A.    He says that while working as a policeman.

6  That's not true.  With Miss Alma, that's different.

7  Q.    Okay.  During the year that you were a policeman

8  you weren't a drug trafficker; right?

9  A.    No, sir.

10  Q.    Then after you stopped becoming a policeman, then

11  you became a drug trafficker?

12  A.    Living with Doña Alma, yes.

13  Q.    That you were a drug trafficker on at least four

14  separate occasions that you conceded to; right?

15  A.    Yes.  Living with Doña Alma, yes.

16  Q.    And on those occasions where you were trafficking

17  in narcotics, it wasn't until May 18th, the fourth trip,

18  that you were arrested; correct?

19  A.    Yes, sir.

20  Q.    And on May 18th you were arrested and you were

21  taken into custody by the United States?

22  A.    Yes.

23  Q.    And how many people were on the go-fast boat with

24  you when you were arrested?

25  A.    Three.

```
 1   Q.      So a total of four?

 2   A.      Three people were aboard the vessel where I was.

 3   Q.      Including you or plus you?

 4   A.      Including myself there were three people.

 5   Q.      And all three of you were put on board the U.S.

 6   frigate?

 7   A.      No.  It was five.

 8   Q.      All right.  Five.

 9           All five of you were put on board the USS Rentz;

10   correct?

11   A.      Yes.

12   Q.      And you were in custody on board, all five of

13   you, for 12 days before you got to Tampa?

14   A.      It wasn't 12 days.  It was between 18 and

15   20 days.  I don't remember how many exactly.

16   Q.      You already conceded that it wasn't 18 to 20 days

17   on your direct examination, didn't you?

18   A.      What was the answer that I gave?

19   Q.      Eighteen to twenty was the original answer that

20   you gave.

21   A.      Yes.  Because I don't remember the exact number

22   of days that I was in custody by Coast Guard.

23   Q.      Your recollection was refreshed by documents that

24   Mr. Ruddy put in front of you; correct?

25   A.      No.
```

1    Q.    During your direct examination Mr. Ruddy put a

2    document in front of you that showed you arrived in Tampa

3    June 1st, 2011; right?

4    A.    Yes.

5    Q.    So we have already established through your

6    concession that it was 12 days on board that boat?

7    A.    Inexactly I said 18 to 20 because I don't

8    remember exactly how many days I was on board the Coast

9    Guard patrol boat.

10   Q.    How ever many days it was, by the time you got to

11   Tampa, you and the other guys on board were ready to talk

12   to the DEA, weren't you?

13   A.    No.

14   Q.    Were there discussions between you and your four

15   co-defendants as to what you were going to do when you

16   got to the United States?

17   A.    At no time.

18   Q.    And so during 12 days at sea the only topic that

19   didn't come up was your arrest and this prosecution?

20   A.    Could you repeat the question, please.

21   Q.    During the whole time that you are waiting to

22   come to Tampa, are you telling us that you and your

23   co-defendants didn't have one discussion about your case?

24   A.    No.

25   Q.    Did the other four talk amongst themselves in

1   your presence about the arrest and the pending

2   prosecution?

3   A.      The arrest -- who are you referring to?

4   Q.      Five people were arrested on the high seas;

5   right?

6   A.      Yes, sir.  Yes, sir.

7   Q.      300 kilograms of cocaine; right?

8   A.      I cannot tell you the amount that we were out to

9   receive.  I was not able to count.  Plus the Coast Guard

10  helicopters flew over us, and in that situation I'm not

11  able to count, so I cannot tell you how much it was.

12  Q.      All right.  Without exact numbers we're talking

13  about hundreds of kilos of cocaine; right?

14  A.      Yes, sir.

15  Q.      You were under way to the United States to get

16  prosecuted, and you're telling me that nobody talks about

17  that subject matter?

18  A.      You're asking me about the quantity of drugs.

19  And I'm telling you that I could not tell you the amount

20  because we were at high sea and I was not able to count

21  it.

22  Q.      Forget the amount.

23          Did you have discussions with your co-defendants

24  about your case, that cocaine and the fact that you were

25  going to get prosecuted in the United States?

A.      We did not speak about this.

Q.      Did anyone discuss whether or not they were going to cooperate and talk to the DEA?

A.      We did not talk about it.

Q.      Sometime before you arrived you decided for yourself that you were going to talk to the DEA once you got to the U.S.; right?

A.      Yes, sir.

Q.      You weren't even going to wait to get a lawyer appointed, were you?

A.      Got off the plane and the gentleman from the DEA read me my rights.  Some questions were asked of me, I answered them.  But I answered things that were not the truth.

Q.      You answered -- I'm sorry?  I didn't hear the last part.  Can you repeat that.

A.      Answered things that were not the truth.

Q.      Okay.  When you spoke to the DEA, you lied to them.  Is that what you're telling us?

A.      Yes, sir.

Q.      What lies did you tell them?

A.      I told them I did not know whose the cocaine was, and that I had been hired by a person that I did not know.  I don't remember what else I told them, but it was lies what I told them.

1   Q.      From beginning to end everything you said to them

2   was made up in a lie; right?

3   A.      To a certain extent, yes.  Later I decided to

4   speak with the truth.

5   Q.      When you told the pack of lies that you told them

6   at the beginning, you soon came to realize that wasn't

7   going to get your sentence reduced, was it?

8   A.      Yes, sir.

9   Q.      Because they don't want to hear that you don't

10  have a name, do they?

11  A.      No.

12  Q.      They want you to give them a name if you're going

13  to get a benefit for cooperating; right?

14  A.      Yes, sir.

15  Q.      That's a dangerous proposition, isn't it?

16  A.      Yes, sir.

17  Q.      Because the drug lords in Guatemala will effect

18  retribution on persons who snitch them out, won't they?

19  A.      Yes.

20  Q.      And you have family in Guatemala, don't you?

21  A.      Yes.

22  Q.      You have a father in Guatemala?

23  A.      Yes, sir.

24  Q.      You have whoever is the first wife who you left

25  to then spend seven years with Miss Hernandez back in

```
 1   Guatemala, don't you?

 2   A.      Yes, sir.

 3   Q.      And you have other relatives in Guatemala?

 4   A.      Yes, sir.

 5   Q.      Who are your other relatives in Guatemala?

 6   A.      Mother, father, brothers, sisters.

 7   Q.      How many brothers and sisters?

 8   A.      Two brothers.

 9   Q.      And sisters?

10   A.      Four sisters.

11   Q.      So six brothers and sisters and parents, that's

12   eight right there; right?

13   A.      Yes, sir.

14   Q.      That's eight people that could very well end up

15   dead if you give up the drug lord in Guatemala; right?

16   A.      Yes, sir.

17   Q.      You don't want to do 16 years in the federal

18   prison, do you?

19   A.      No.

20   Q.      And you know parole has been abolished?

21   A.      What do you say?

22   Q.      You know if you get 16 years, you're going to do

23   16 years?

24   A.      Yes, sir.

25   Q.      But you don't want to get eight family members
```

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

1    killed either, do you?

2    A.    Yes, sir.

3    Q.    So you want to accomplish both things.  You want

4    to get your sentenced reduced and you don't want to have

5    to feel retribution; right?

6    A.    Yes.

7    Q.    So here's your fall guy, Miss Hernandez; right?

8    A.    Yes, sir.

9    Q.    Now, with regard to all of the trips that you say

10   happened where you say that Miss Hernandez was the boss

11   and directed you to do everything, with regard to all of

12   those trips and all the conduct that you attribute to

13   Miss Hernandez, the only proof that you have that those

14   things happened are the words that leave your mouth;

15   isn't that right?

16   A.    Yes, sir.

17   Q.    Now, you testified on direct examination that you

18   were forced to remain in a relationship with

19   Miss Hernandez under the threat of murder if you left?

20   A.    Yes, sir.

21   Q.    You also -- I'm sorry.

22   A.    Yes, sir.

23   Q.    You also implicated during the course of your

24   direct examination all sorts of family members of hers,

25   did you not?

1    A.    Yes, sir.

2    Q.    Review with me again who those people were by way

3    of relationship to her.

4    A.    Well, on some occasions there was Jorge Edwardo

5    Preciado, who's her brother.

6    Q.    Okay.  Brother.

7          Who else?

8    A.    I was there as well.

9    Q.    Okay.  Are you a relative of hers as a common law

10   husband?  Is that why you're including yourself in the

11   list?

12   A.    I don't know if you want to call it a family

13   member or wife.  They're different things.

14   Q.    Besides her brother, did you mention an aunt?

15   A.    Yes, I did mention Marcia Isabel Gonzalez

16   Preciado, but I didn't say that she had anything to do

17   with her with that.

18   Q.    Who are the people related to her that you

19   mentioned were involved in drug trafficking activities?

20   A.    Well, the brother only, Jorge.

21   Q.    And where is the brother as we speak today?

22   A.    No, no, I don't know.

23   Q.    He's not in custody, is he?

24   A.    Not that I know of.

25   Q.    Miss Hernandez is in custody, isn't she?

```
1    A.    Yes, sir.

2    Q.    Okay.  You told this jury that you were afraid to

3    leave her because she'd kill you if you left.

4          MR. RUDDY:  Objection, Your Honor.  That is

5    not his testimony.

6          THE COURT:  It's not that she would --

7    sustained.

8    BY MR. MARTINEZ:

9    Q.    What was it that you were saying would happen to

10   you if she terminated your -- if you -- if you left

11   Miss Hernandez?

12   A.    Well, what I said was that on some occasions

13   after we had been arguing, and I told her that I wanted

14   to separate from her, she said that I had to stay with

15   her.  Because if I did leave her, that I would be signing

16   my death sentence.

17   Q.    So she threatened to kill her if you left her.

18   Do I have that right?

19   A.    Yes, sir.

20   Q.    Okay.  You're not just leaving her here, you are

21   throwing her completely under the bus, aren't you; right?

22   A.    Yes, sir.

23   Q.    You know full well what time she's facing because

24   you're facing it, aren't you; right?

25   A.    Yes, sir.
```

1    Q.    And you wouldn't leave her because you were

2    afraid of retribution; right?

3              THE INTERPRETER:  Because you were not

4    afraid of retribution?

5    BY MR. MARTINEZ:

6    Q.    You wouldn't leave her because you were afraid of

7    retribution?

8    A.    Yes, sir.

9    Q.    But you're not afraid of retribution for sending

10   her to the federal penitentiary for decades?

11   A.    No, sir.

12   Q.    Okay.  And is that because she's in custody here

13   in the United States?

14   A.    Yes, sir.

15   Q.    What about all the family in Guatemala?

16   Specifically what about her brother who you say is a drug

17   dealer in Guatemala?

18   A.    I feel reassured, calm as far as that's

19   concerned.

20   Q.    So you don't think that your eight close family

21   relatives in Guatemala are at risk for what you're doing

22   here?

23   A.    Yes, I do.  But I am calm.

24   Q.    You're calm because you know she's not a drug

25   dealer and her brother is not a drug dealer; isn't that

1  right?

2  A.    (No response.)

3  Q.    Mr. Lara, during the course of your direct

4  examination there were many occasions where you would

5  pause for a great period of time before responding.  Do

6  you remember that?

7  A.    Yes.

8  Q.    You do that because it gives you time to think of

9  an answer, doesn't it?

10  A.    I am thinking of an exact response because I

11  can't just say any old thing.

12  Q.    The truth should roll off your tongue, shouldn't

13  it?

14  A.    I have to remember.

15  Q.    Like what Miss Hernandez looks like?

16  A.    Fine.

17  Q.    So that long pause was to think it through?

18  A.    Yes.

19  Q.    When did you decide to tell the DEA that what you

20  told them initially was a big fat lie?

21  A.    I don't remember when.  But, yes, I did tell them

22  that I had lied to them.

23  Q.    Well, was it the next day, the next week the next

24  month?  Give me an approximation.

25  A.    It was approximately four or five months later.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      Four or five months later.

2            So for four or five months you stuck to your

3    story which you now say was a lie?

4    A.      Yes, sir.

5    Q.      And it was after you pled guilty and you realized

6    that you were facing a potential life sentence that you

7    decided to revisit that conversation, isn't it?

8    A.      Yes, sir.

9    Q.      And so the motivation here to come clean was the

10   huge sentence that was on top of your head?

11   A.      Yes.

12   Q.      Now, you were co-defendants with four other

13   people that you never spoke to about any of this on the

14   whole way to Tampa.  Those individuals were also in

15   custody with you, weren't they?

16           THE INTERPRETER:  The question at the end,

17   they were also?

18   BY MR. MARTINEZ:

19   Q.      They were also in custody with you?

20   A.      Yes, sir.

21   Q.      And all of them were in the same Pinellas County

22   Jail?

23   A.      Yes, in Pinellas we were, yes.  But in Citrus we

24   were in different sections.

25   Q.      But you go to Citrus County Jail after you plead

1  guilty; correct?

2  A.    Yes, sir.

3  Q.    You stay in the Pinellas County Jail while your

4  case in Tampa Federal Court is pending, don't you?

5  A.    Yes.

6  Q.    And your co-defendants, same thing.  They stay in

7  Pinellas until their case is resolved by a plea or a

8  trial, and then they go to Citrus; isn't that right?

9  A.    Yes, sir.

10  Q.    And the co-defendants in your case who are all at

11  the same Pinellas County Jail with you, do you have

12  conversations with them about your case?

13  A.    No.

14  Q.    So the whole time you're on the boat and the

15  whole time all of you all are in the same jail, nobody

16  talks about the case?

17  A.    No.

18  Q.    Don't you think it would have been helpful for

19  everybody to get on the same page in terms of what they

20  were ultimately going to say?

21  A.    No.

22  Q.    As a drug trafficker don't you plan things?

23  A.    No.

24  Q.    Didn't you plan to throw your drugs overboard so

25  that the government and the United States wouldn't find

1  it?

2  A.     No.  That was decided by the other gentleman that

3  was there from South America.

4  Q.     But you would have concluded the same thing;

5  right?  See the helicopters, dump the drugs.  You would

6  have concluded that on your own, wouldn't you?

7  A.     Yes, sir.

8  Q.     Okay.  And likewise, dump the satellite phone

9  into the ocean as well; right?

10  A.     Yes, sir.

11  Q.     Okay.  And that's because you want to limit your

12  criminal liability and evidence that the government has

13  against you?

14  A.     Yes, sir.

15  Q.     And likewise, you want to limit your criminal

16  liability by cooperating against the people above you to

17  get your sentence reduced?

18  A.     Pardon me?  I would like to you repeat the

19  question, please.

20  Q.     Okay.  Just like you planned to limit your

21  criminal liability on the high seas, you are going to

22  plan to limit your criminal liability while on board that

23  boat and in the Pinellas County Jail, aren't you?

24  A.     Well, at the point that we were detained we threw

25  the drugs overboard into the water to get rid of the

1    drugs.  But that is what is normally done.

2    Q.    Isn't it normally done to try to convince the DEA

3    of any story you tell them being true to reduce your

4    sentence?  Isn't that a normal thing for a drug

5    trafficker to do?

6                THE INTERPRETER:  The interpreter would like

7    to use a different word so that the question is

8    understood.  With your permission.

9                MR. MARTINEZ:  Whatever you need to

10   translate.

11               THE WITNESS:  That's what I thought of when

12   I was going to speak to agents of the DEA, which is what

13   any drug trafficker will do.  They'll tell them anything

14   in order to deviate from the truth.

15   BY MR. MARTINEZ:

16   Q.    That was your plan?

17   A.    It wasn't a plan.  It's what I thought of when I

18   spoke to the agents of the DEA.  That's what I said.

19   Q.    Do you remember the questions that Mr. Ruddy

20   asked you about Attorney Darlene Barror?

21   A.    Yes, sir.

22   Q.    And you remember that you were trying to get a

23   lawyer to represent multiple defendants in your case;

24   right?

25   A.    Pardon me?  Repeat the question.  What did you

1    say?

2    Q.    You ended up with Darlene Barror representing

3    you; right?

4    A.    Yes, sir.

5    Q.    And you wanted to get her to represent other of

6    the co-defendants in your case as well as you; right?

7    A.    The problem was that the attorney who was

8    representing me was from the states and he spoke English

9    only.

10    Q.    That wasn't my question.

11    My question was, did you try to get Darlene

12    Barror to represent not only yourself, but other

13    co-defendants in the same case?

14    A.    That I did not plan.  That was something that had

15    been spoken about beforehand with Doña Alma.  We were --

16    ended up detained.  She was going to pay for an attorney

17    to look out for us.

18    Q.    And you wanted -- you wanted that to happen so

19    that you and your co-defendants could be on the same

20    page; right?

21    A.    I told Mr. Mijangos whether he agreed for

22    Miss Barror to represent us.  But he said no, that he was

23    fine with the attorney he had.

24    Q.    So you did have conversations with him while the

25    case was pending?

1    A.    But it was afterwards.

2    Q.    No.

3          Your case was still pending, wasn't it?

4    A.    Yes.  That was in Citrus.

5    Q.    Right.

6          Your case wasn't over.  If your case was over,

7    you wouldn't need a lawyer; right?

8    A.    Yes, sir.

9    Q.    So while your case was pending, you were talking

10   and corroborating with your co-defendants as you just

11   admitted; correct?

12   A.    It was just one occasion when I was about to be

13   represented by Miss Darlene Barror that I asked Mr. De

14   Leon if he wanted to be represented by her as well on

15   this one occasion.

16   Q.    Why would it matter to you if your lawyer spoke

17   Spanish if he had an interpreter in tow with him every

18   time you spoke?

19   A.    He only spoke English.  And there were things

20   that I did not understand the interpreter because

21   sometimes I get confused.

22   Q.    So it's your testimony that the interpreter that

23   the lawyer used wasn't competent in the Spanish language

24   and you couldn't understand him?

25   A.    There are people who speak English and Spanish,

1   and there are words in Spanish that they do not pronounce

2   well.

3   Q.     So it was a pronunciation issue?

4   A.     Yes, sir.  But also that on one occasion

5   Mr. McCluskey arrived onto Citrus, we waited.  He looked

6   for a person -- I don't know who he was -- to be able to

7   speak with me.  Because while we were waiting, we did not

8   exchange a word because at that time the interpreter was

9   not there.

10  Q.     When did your case end?  When did you get

11  sentenced?

12  A.     I don't remember exactly.  I believe it was

13  February 2012.

14  Q.     February 2012.

15         So you still have 15 years to do of your 16-year

16  sentence approximately?

17  A.     Yes, sir.

18  Q.     Now, where -- in anticipation of this trial,

19  Miss Hernandez' trial, where have you been housed?

20  A.     Could you repeat the question.

21  Q.     I'm sorry?  Could I repeat the question?

22             THE INTERPRETER:  (Nods head.)

23  BY MR. MARTINEZ:

24  Q.     Where have you been housed?

25  A.     After my sentence?

```
1    Q.    Well, after your sentence were you designated to
2    a Bureau of Prisons facility?
3    A.    Yes, sir.
4    Q.    Where was that?
5    A.    Prison of Lexington, Kentucky.
6    Q.    When this trial started to get close, you were
7    transported from Kentucky, which is another state, to a
8    location close to Tampa, were you not?
9    A.    Yes, sir.
10   Q.    And that closer location within the state is the
11   Citrus County Jail, is it not?
12   A.    No.  I'm in Pinellas.
13   Q.    You're in Pinellas.
14         Even closer; right?
15   A.    Yes, sir.
16   Q.    Now, your co-defendants who are also testifying
17   in this case, where are they being housed?
18   A.    Also in Pinellas.
19   Q.    And when you come from the Pinellas County Jail
20   to the Tampa federal courthouse, you come in a van, don't
21   you?
22   A.    Yes, sir.
23   Q.    And was anyone in the van with you today?
24   A.    No, sir.
25   Q.    Okay.  But all of you are in the same Pinellas
```

```
 1    County Jail as we speak?
 2    A.      Yes, sir.
 3    Q.      Okay.  And in anticipation of you and your
 4    co-defendants being on the same page in the Hernandez
 5    trial, have you had conversations with them at the
 6    Pinellas County Jail?
 7    A.      No.
 8    Q.      What pod are you in?
 9    A.      Sixth C floor.
10    Q.      Six C.
11            Are your co-defendants also all on the 6th floor?
12    A.      Yes, sir.
13                 MR. MARTINEZ:  No further questions.
14                 THE COURT:  All right.  Mr. Ruddy.
15                       REDIRECT EXAMINATION
16    BY MR. RUDDY:
17    Q.      Who is going to pay for De Leon's private
18    attorney?  Is it going to be you?
19    A.      No.
20    Q.      Who?
21    A.      Doña Alma.
22    Q.      Doña Alma.
23            Who is going to pay for Mijangos' private
24    attorney?
25    A.      Also Doña Alma.
```

1   Q.    Diego Perdomo, did he know Alma?

2   A.    My understanding is he did not know her.

3   Q.    So did you ask Diego Perdomo if he wanted a

4   private lawyer paid for by Alma?

5   A.    I don't remember having asked that.

6   Q.    Well, like you did with my other questions today,

7   take some time to think about it.  Did you ever ask him?

8   A.    I don't remember having asked him.

9   Q.    Okay.  So now, Mr. Meros, the Ecuadorian, did he

10  know Alma?

11         THE INTERPRETER:  Come again.  What's that

12  name, Mr. --

13         MR. RUDDY:  Mr. Meros, M-E-R-O-S.

14         THE WITNESS:  That I know of he did not know

15  her.

16  BY MR. RUDDY:

17  Q.    There's an Ecuadorian on the vessel; right?

18  A.    Yes, sir.

19  Q.    He didn't know Alma, did he?

20  A.    That I know of, he did not know her.

21  Q.    Did you ask Mr. Meros Cedeño if he wanted a

22  private lawyer paid for by Alma?

23  A.    I don't remember having asked that either, sir.

24  Q.    But you, you got one; right?

25  A.    An attorney?

```
 1    Q.      Paid for by Alma; right?

 2    A.      Yes, sir.

 3    Q.      And the other two people --

 4              MR. MARTINEZ:  Objection -- sorry.  Go

 5    ahead.

 6              THE WITNESS:  -- did not receive it because

 7    they said no.

 8    BY MR. RUDDY:

 9    Q.      Now, you had made a response to one of the

10    questions that counsel for Alma Hernandez asked you about

11    Alma being the fall guy; is that right?  Do you recall

12    that?

13    A.      Could you please repeat the question.

14    Q.      Was Alma ever going to be treated as the fall

15    guy?

16    A.      That I know of we had not spoken about that.

17              MR. RUDDY:  One moment, please, Your Honor.

18    Nothing further.

19              THE COURT:  Anything else, Mr. Martinez?

20              MR. MARTINEZ:  No, Your Honor.

21              THE COURT:  What?

22              MR. RUDDY:  Nothing further of this witness.

23              THE COURT:  You may step down.

24              Mr. Ruddy, who's your next witness?

25              MR. RUDDY:  Mr. Mijangos.
```

```
1              THE COURT:  Are they also in custody?

2              MR. RUDDY:  Yes.

3              THE COURT:  It's about 20 minutes of.

4    You've got only about nine minutes.  Do you want to wait

5    till tomorrow?

6              MR. RUDDY:  Yes, Your Honor.

7              THE COURT:  All right.  Ladies and

8    gentlemen, tomorrow is the one morning we are not going

9    to start at 9 o'clock.  We are going to start at

10   10 o'clock tomorrow morning.  I have a hearing before we

11   start the trial.

12             So not 9 o'clock, 10 o'clock.  And then on

13   Thursday we will go back to the 9 o'clock schedule.

14   Tomorrow we will start at 10 o'clock in the morning, and

15   you'll need to be here so that we can start promptly at

16   10:00.

17             Please leave your pads on your chairs.

18   Please don't discuss the case.  And I'll see you at

19   10 o'clock tomorrow morning.

20             COURT SECURITY OFFICER:  All rise, please,

21   for the jury.

22        (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

23             THE COURT:  I have statuses tomorrow and

24   then a change of plea, so there'll be some attorneys in

25   here.  If you want -- the interpreters, if you want to
```

1    leave anything, put it down at that end.

2         MR. RUDDY:  Your Honor, we're going to take

3    our laptops.  We can leave this overnight, but I think

4    with the statuses it's probably better --

5         THE COURT:  That's fine.  Take your laptop.

6         MR. MARTINEZ:  Your Honor, in that regard if

7    I move my stuff to the back table is that good enough?

8         THE COURT:  That's fine.

9              (PROCEEDING ADJOURNED.)

10         I CERTIFY that the foregoing is a true and

11   accurate transcription of my stenographic notes.

12   Dated:  02/14/2014.

13

14              ___s/ Sandra K. Provenzano_____
                   SANDRA K. PROVENZANO, RPR
15                 Official Court Reporter

16

17

18

19

20

21

22

23

24

25